Opinion for the Court filed by Circuit Judge TATEL.
 

 TATEL, Circuit Judge:
 

 Petitioners challenge a decision and order of the National Labor Relations Board adopting an administrative law judge’s determination that they engaged in unfair labor practices during collective bargaining negotiations and an ensuing strike. The Board cross-petitions for enforcement. We affirm the Board on its primary ruling in this case — that petitioners violated the National Labor Relations Act by substituting employer-sponsored benefit plans for union plans without bargaining with the union. We also affirm the Board’s determination that petitioner Exhibitree violated the Act by renouncing and bypassing the union after it struck the company and by encouraging employees to resign their union membership. However, in light of the ALJ’s finding that Exhibitree did not intend to change its holiday and overtime provisions, and in the absence of evidence of employee harm, we reverse the Board’s determination that an
 
 *-700
 
 nouncement of the changed provisions violated the company’s duty to bargain. . Finally, we remand for further consideration whether the Board’s remedial. order, requiring that petitioners make up all unpaid contributions to the union benefit plans, must be revised to avoid a windfall for the plans.
 

 ,1
 

 Petitioners Grondorf, Field, Black & Company, and Exhibitree, Inc., both of Irvine, California, design and build trade show exhibits. Since 1983, the companies’ exhibit-building employees have been represented by the Sign, Scene, Pictorial Painter, Display and. Decorators, Local • 831, International Brotherhood of Painters and Allied Trades, AFL-CIO. Pursuant to collective bargaining agreements, the union has provided bargaining unit employees with a health and welfare plan and a pension plan, each partially funded by company contributions.
 

 On August 1, 1991, with their existing agreements set to expire later in the month, the companies and the union met to negotiate new collective bargaining agreements. At the outset of the talks, the companies’ negotiator gave union representatives a letter highlighting the companies’ proposed areas of discussion, including employee benefit plans. The letter said that the companies wished to explore “all options,” including either limiting employer contributions to the union plans or switching to employer-sponsored plans. In response, the union insisted that the companies increase their contributions to the union plans. The companies then formally proposed capping monthly contributions to the union health and welfare plan and freezing the rate of contributions to the pension plan. With that offer on the table, Exhibitree President John Schumacher and Grondorf Executive Secretary Mike Field expressed their view that the companies’ own health insurance and retirement plans, available to nonunion employees, provided better benefits at lower cost than the union plans. Union negotiator Grant Mitchell responded that switching to the company plans was unacceptable. .
 

 When' the parties met again later in the month, the union rejected the companies’ cap on health and welfare contributions but suggested that it might agree to a freeze on pension plan contributions. After further discussion of the differences between the competing proposals, the companies’ negotiator announced that, in his opinion, the parties had reached an impasse, and that the companies would prepare a final offer containing essentially the same provisions as their earlier proposal. Mitchell stated that the union wished negotiations to continue. After one more day of negotiations in mid-September bore no fruit, the companies presented their final offer, proposing again a cap on health and welfare contributions and a freeze on the rate of pension contributions. In an accompanying letter, the companies stated that, if the union did not accept the proposal, they would' enroll bargaining unit employees in company-sponsored health and retirement plans.
 

 Rejecting the final offer, the union struck both companies. When many Grondorf employees crossed picket lines, management distributed to returning employees a document detailing new terms and conditions of employment, including participation in company health and retirement plans. Grondorf subsequently discharged a returning employee, Steve Kennedy, after interrogating him about his union sentiments and .learning that he would be rejoining the picket line. ■
 

 At Exhibitree, all bargaining unit émploy-ees initially honored the strike. After advertising for replacement workers, Exhibitree’s management telephoned unit employees as well as new job applicants, inviting them to attend a meeting at the company on September 30. Approximately twenty-five individuals responded, including eighteen strikers. At the meeting, management distributed a letter stating that Exhibitree was now “an open shop” and that workers were “free[d] from dues and the periodic hassle of negotiating through ‘agents’ [who] represent [them].” The document also stated that employees would be covered under Exhibitree’s health insurance and profit sharing plans. Styled “guidelines,” a second document also distributed at the meeting set forth new terms and conditions of employment. In addition to reiterating the new benefits scheme, the guidelines listed eight paid holidays — one
 
 *-699
 
 fewer than under the companies’ final offer to the union — and overtime provisions varying from those previously proposed. The guidelines stated that they represented “the sole understanding between the parties” and included an employee signature page.
 

 After Exhibitree’s top executives left the meeting, striking workers told Courtney McMillan, Exhibitree’s manager of manufacturing, of their concern that they would be fined by the union should they cross picket lines to return to work. In response, McMillan prepared and distributed a union resignation form with spaces for employee signatures. Twelve striking employees signed the form. McMillan’s secretary added the employees’ names next to their signatures, and sent the form by facsimile to the union. Workers who signed the forms returned to work; those who did not left the meeting. Using copies of the form supplied by McMillan, an additional six striking- workers resigned from the union and returned to work over the next several days. Again, McMillan had the forms completed and forwarded to the union.
 

 After realizing that the guidelines contained holiday and overtime provisions different from those included in the companies’ final offer, Exhibitree’s management distributed new guidelines along with a letter acknowledging their earlier mistake. While correcting the holiday and overtime provisions, the new guidelines repeated the assertion that all employees were, now covered by Exhibitree’s benefit plans. In mid-October, the companies notified the union that they were ceasing contributions to - both union plans.
 

 The Board’s general counsel charged the companies with engaging in unfair labor practices. After a seven-day hearing, an administrative law judge found that the companies had violated section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) (1994), by denying the union the opportunity to bargain over the change from union benefit plans to employer-sponsored plans and by then discontinuing contributions to the union plans. ' With respect to post-strike events, the ALJ concluded that Exhi-bitree had violated section 8(a)(1) of the Act by renouncing and bypassing the union at the September 30 meeting and by soliciting and inducing employees to resign from the union. The ALJ dismissed the union’s charge that Exhibitree had unilaterally implemented new holiday and overtime provisions, finding that discrepancies between the guidelines distributed on September 30 and the companies’ final offer were inadvertent and promptly corrected. Finally, the ALJ found that Grondorf coercively interrogated and then fired employee Kennedy because of his union activity in violation of sections 8(a)(1) and (3) of the Act.
 

 Finding publication of the revised guidelines insufficient to repudiate the company’s earlier improper conduct, the Board reversed the ALJ’s finding that Exhibitree’s announcement of different holiday and overtime provisions did not constitute an unfair labor practice. In all other respects the Board affirmed the ALJ, ordering the companies to cease their unlawful practices, bargain collectively with the union, and make up all unpaid contributions to the union plans.
 
 Grondorf, Field, Black & Co.,
 
 318 N.L.R.B. 996 (1995).
 

 Grondorf and Exhibitree filed this petition for review, arguing that the Board’s decision is unsupported by substantial evidence and that its remedial order is punitive. Because Grondorf does not challenge the Board’s finding that the company violated the NLRA by firing Steve . Kennedy, we grant the Board’s petition to enforce that portion of its order.
 
 See International Union of Petroleum & Indus. Workers v. NLRB,
 
 980 F.2d 774, 778 n. 1 (D.C.Cir.1992) (findings not challenged before the Board are entitled to summary enforcement). Reviewing the contested portions of the Board’s decision and order, we “give considerable deference to the Board’s interpretation of the NLRA and must accept the Board’s determinations if they are supported by substantial evidence.”
 
 Lucile Salter Packard Children’s Hosp. v. NLRB,
 
 97 F.3d 583, 588 (D.C.Cir.1996);
 
 see also
 
 29 U.S.C. § 160(f) (1994).
 

 II
 

 Beginning with the companies’ claim that implementing their own benefit
 
 *-698
 
 plans and discontinuing contributions to the union plans did not violate the Act, we apply a set of familiar principles. Sections 8(a)(5) and 8(d) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5), 158(d) (1994), “require an employer to bargain ‘in good faith with respect to wages, horn’s and other terms and conditions of employment.’ ”
 
 Litton Fin. Printing Div. v. NLRB,
 
 501 U.S. 190, 198, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991) (quoting 29 U.S.C. § 158(d));
 
 Fibreboard Paper Prod. Corp. v. NLRB,
 
 379 U.S. 203, 209-10, 85 S.Ct. 398, 402-03, 13 L.Ed.2d 233 (1964). An employer violates this statutory obligation if, “without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment.”
 
 Litton Fin. Printing,
 
 501 U.S. at 198, 111 S.Ct. at 2221. When impasse occurs, an employer may implement only those changes reasonably falling within its pre-impasse proposal.
 
 See, e.g., Southwest Forest Indus., Inc. v. NLRB,
 
 841 F.2d 270, 273 (9th Cir.1988).
 

 Reviewing the record in this ease, we find substantial evidence to support the Board’s finding that during the course of bargaining the companies did not propose substituting employer-sponsored plans for union plans and that their later implementation of this change in employee benefits violated section 8(a)(5). According to testimony credited by the ALJ, although company executives discussed the merits of employer-sponsored plans at the negotiations, the companies neither submitted a concrete proposal to switch employees out of the union plans nor provided documentation or other details about the companies’ benefits package. The only subject of bargaining was the companies’ proposal to limit contributions to the union plans, a proposal reiterated in the companies’ final offer and ultimately rejected by the union. Having failed to afford the union a genuine opportunity to bargain over their proposal to switch benefit plans, the companies were not free, to implement the substitution of plans on their own.
 
 See Litton Fin. Printing,
 
 501 U.S. at 198, 111 S.Ct. at 2221;
 
 Peerless Roofing Co. v. NLRB,
 
 641 F.2d 734, 735 (9th Cir.1981).
 

 Ill
 

 We turn next to Exhibitree’s challenge to the Board’s determination that the company engaged in unfair labor practices after the strike commenced. According to Exhibitree, the record contains insufficient evidence to support the Board’s determinations that the company unlawfully solicited and induced employees to resign union membership and conditioned return to work on such resignation, unilaterally changed holiday and overtime provisions, and renounced and bypassed the union. We consider each issue in turn.
 

 Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), prohibits employers from interfering with, restraining, or coercing employees in the exercise of their statutory right to union membership. Under well-settled Board precedent, although employers may give employees information about how to resign from a union, they violate section 8(a)(1) if they “‘attempt to ascertain whether employees will avail themselves of this right [ ]or offer[ ] any assistance, or otherwise ere-ate[] a situation where employees would tend to feel peril in refraining from such revocation.’ ”
 
 Manhattan Eye, Ear & Throat Hosp.,
 
 280. N.L.R.B. 113, 114, 1986 WL- 53984 (1986) (quoting
 
 R.L. White Co.,
 
 262 N.L.R.B. 575, 576, 1982 WL 31820 (1982)),,
 
 enf'd,
 
 814 F.2d 653 (2d Cir.1987).
 

 Again reviewing the record, we find substantial evidence to support the ALJ’s finding, adopted by the Board, that Exhibitree manager McMillan violated the Act by helping striking workers resign from the union. Having assembled a select group of striking employees on September 30 to discuss returning to work and learning that some workers feared union fines should they cross picket fines, McMillan prepared and distributed the union resignation form. He then waited for and obtained the signatures of several employees, completed and dated the form, and forwarded it to. the union’s business manager.- Only the twelve strikers who resigned from the union went to work that day, and employees who subsequently returned to work gave McMillan signed copies of Exhibitree’s resignation form. Taken as a whole, this evidence supports the Board’s conclusion that McMillan, going be
 
 *-697
 
 yond simply providing information to striking workers, assisted — indeed encouraged — their resignations. Because substantial evidence supports the charge that Exhibitree violated section 8(a)(1) by soliciting union resignations, we need not consider the ALJ’s additional finding that resignation from the union was a condition of continued employment.
 

 We have a different view of the Board’s determination that Exhibitree violated section 8(a)(5)’s duty to bargain by unilaterally imposing new holiday and overtime provisions on returning workers. According to the ALJ, the omission of a single holiday from the September 30 guidelines was a “simple inadvertence” and the disparity in the overtime provisions was “comparabl[e].”
 
 Grondorf,
 
 318 N.L.R.B. at 1007. Leaving this factual determination undisturbed, the Board reversed the ALJ’s dismissal of the charge, concluding that Exhibitree violated section 8(a)(5) because its subsequent correction of the guidelines was not an “effective repudiation” of the company’s earlier conduct.
 
 Id.
 
 at 996-97;
 
 see Passavant Mem’l Area Hosp. v. Health Care Local Union No. 1401,
 
 237 N.L.R.B. 138, 1978 WL 7798 (1978) (establishing criteria for repudiation of unlawful conduct). In reaching this conclusion, the Board simply assumed that an employer violates section 8(a)(5) when it announces terms of employment that inadvertently deviate from those that it may lawfully impose, even if the mistake is corrected before the terms have any effect in the workplace. Finding this assumption untenable, we reverse the Board’s determination that Exhib-tree’s announcement of vacation and overtime provisions violated section 8(a)(5).
 

 The NLRA requires an employer to bargain in good faith over terms and conditions of employment. 29 U.S.C. § 158(a)(5), (d). An employer’s unilateral change in terms or conditions violates the Act, even absent bad faith, because “there is no occasion to consider the issue of good faith if a party has refused even to negotiate
 
 in
 
 fact— ‘to meet ... and confer! — about any of the mandatory subjects” of bargaining.
 
 NLRB v. Katz,
 
 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962) (quoting 29 U.S.C. § 158(d)). To be tantamount to a “refusal to negotiate,” and therefore violate section 8(a)(5) without a finding of bad faith, we think an employer’s unilateral change in terms or conditions of employment must, at a minimum, be deliberate. Where the change is a simple mistake, promptly corrected without harm to employees, an employer may not reasonably be found to have breached its statutory duty to bargain. Put another way, in order to impose liability under the Act, although the Board need not find that an employer intended to frustrate the bargaining process through a unilateral change in terms or conditions of employment, the Board must at least determine that the employer either intended to make the unilateral change in the first instance, or failed to remedy an otherwise inadvertent change once discovered. At oral argument, counsel for the Board conceded as much, agreeing that a secretary’s typographical error omitting a holiday from a workplace announcement would not constitute a violation of section 8(a)(5). Confronted with similar conduct in this case, and with no record evidence that employees were harmed by Exhibitree’s slip-up, we cannot accept the Board’s determination that the company’s inadvertence violated the Act.
 

 As to the final issue, we agree with the Board that Exhibitree failed to preserve for review its objection to the ALJ’s determination that the company violated section 8(a)(1) by renouncing and bypassing the Union at the September 30 meeting. Section 10(e) of the Act provides that “no objection that' has not been urged before the Board ... shall be considered by the court_” 29 U.S.C. § 160(e).’ Although briefing and argument before the Board are not mandatory, section 10(e) requires that petitioners at least “ ‘apprise thé Board that the party intends to press the question’ on appeal” by noticing an objection.
 
 Local 900, Int’l Union of Elec., Radio and Mach. Workers v. NLRB,
 
 727 F.2d 1184, 1191-92 (D.C.Cir. 1984) (quoting
 
 Marshall Field & Co. v. NLRB,
 
 318 US. 253, 255, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943)). Here, Exhibitree notified the Board that its exceptions to the ALJ’s decision “relat[edj solely and exclusively With [sic] the following two (2) substantive issues” — the change in benefit plans and employee resignations from the union. Exhi-bitree Exceptions at' 1. Briefing these is
 
 *-696
 
 sues, the company stated that “as to the issue of ‘by passing1 the Union, Exhibitree reluctantly does not except to the decision on this holding because there is sufficient evidence in the trial record to support such order.” Respondent Exhibitree’s Brief in Support of Exceptions at 2. Although Exhi-bitree now disagrees with its lawyer’s concessions, we find that these representations to the Board waived any challenge to the ALJ’s determination that the company renounced and bypassed the union. We thus affirm the Board’s decision and order on this score.
 
 See International Union of Petroleum & Indus. Workers,
 
 980 F.2d at 778 n. 1.
 

 IV
 

 This brings us finally to the companies’ challenge to the Board’s order requiring them to make “all contributions to the union pension and health and welfare funds that have not been paid” since the strike.
 
 Grondorf,
 
 318 NLRB at 998. According to the companies, the Board’s order is punitive because employees returning to work were covered under employer-sponsored health and retirement plans that provided comparable benefits. We agree with the companies that the Board’s order requires clarification.
 

 While the Board has broad discretion to fashion appropriate orders to alleviate the effects of unfair labor practices,
 
 see, e.g., United Food & Commercial Workers Int’l Union v. NLRB,
 
 852 F.2d 1344, 1347 (D.C.Cir.1988), its orders must be remedial, not punitive. Where an employer unlawfully ceases contributions to a union benefit fund, the Board, with court approval, generally requires the employer to make up the contributions.
 
 See, e.g., Stone Boat Yard v. NLRB,
 
 715 F.2d 441, 446 (9th Cir.1983). Courts have recognized, however, that if an employer has provided employees with alternative benefits, reimbursement is inappropriate to the extent that it “fails to benefit the employees” and “results in a windfall for the union funds.”
 
 Manhattan Eye, Ear & Throat Hosp. v. NLRB,
 
 942 F.2d 151, 160 (2d Cir.1991);
 
 see NLRB v. Katz’s Delicatessen,
 
 80 F.3d 755 (2d Cir.1996);
 
 Ron Tirapelli Ford, Inc. v. NLRB,
 
 987 F.2d 433 (7th Cir. 1993).
 

 Notwithstanding the presence of alternative plans, the Board required the companies to make up all contributions to the union funds, explaining that “ ‘[e]mployees have, in addition to a stake in receiving benefits negotiated on their behalf by their chosen representatives, a clear economic stake in the viability of funds to which part of their compensation was remitted.’”
 
 Grondorf,
 
 318 NLRB at 997 (quoting
 
 Manhattan Eye, Ear & Throat Hosp.,
 
 300 N.L.R.B. 201, 201-202, 1990 WL 162056 (1990),
 
 enf. denied,
 
 942 F.2d 151 (2d Cir.1991)). We agree with the Board that the companies must contribute to the union plans to the extent necessary to make employees absolutely whole and to ensure the plans’ undiminished viability. In light of the benefits provided under the employer-sponsored plans, however, the companies should be allowed to demonstrate what they suggest here — that their contributions to the union plans must be reduced to avoid an improper windfall for those plans. On remand, the companies should have an opportunity to make that demonstration to the Board.
 

 For the foregoing reasons, the companies’ petition and the Board’s cross-petition are each granted in part and denied in part, and the matter is remanded to the Board for further proceedings.
 

 So ordered.