**W.C. McQUAIDE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 97–1068.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 10, 1997.

Decided Jan. 16, 1998.

**1.** *See* 29 U.S.C. § 158(a)(1),(3),(4) (1988).

**2.** *Wright Line*, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enf'd on other grounds*, 662 F.2d

Michael A. Taylor argued the cause for petitioner, with whom Celeste M. Wasielewski was on the brief.

Marion Griffin, Attorney, National Labor Relations Board, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on the brief. John D. Burgoyne, Assistant General Counsel, entered an appearance.

Before: EDWARDS, Chief Judge, GINSBURG and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Petitioner W.C. McQuaide, Inc. seeks review of a decision and order of the National Labor Relations Board finding that the company had violated sections 8(a)(3), (4), and (1) of the National Labor Relations Act[1] by discriminating against sixteen employees because they engaged in union activity, and against three employees because they initiated or testified in Board proceedings. The company contends that the Board failed to give appropriate consideration to the company's *Wright Line*[2] defenses to the section 8(a)(3) allegations, which it argues exonerated it for acting against employees who would have been subjected to discipline regardless of their union activities. The company maintains that the administrative law judge ignored evidence, ruled that several employees had been constructively discharged although the complaint had not included such an allegation, and made credibility determinations that were unsupported by the record. Because we conclude, with one exception, that the company's challenges to the Board's decision and order are unpersuasive, we grant the petition in part and deny the petition in part. Conversely, we grant the Board's

899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

cross-petition for enforcement of its order in part and deny it in part.

## I.

■ McQuaide is a family-owned and operated interstate trucking and warehousing business. The company has successfully resisted attempts to unionize its employees in the past, and was found to have engaged in unfair labor practices on one prior occasion. The instant charges arose out of McQuaide's most recent efforts to maintain a union free shop. The company does not contest the Board's finding that it violated section 8(a)(1) by repeatedly threatening reprisals and discharges against employees for supporting the union, by coercively interrogating employees about their union activities, by creating the impression that employee's union meetings were under surveillance, by preventing one employee from wearing a union insignia and passing out union cards, and by telling employees that a wage increase depended on their defeat of the union or withdrawal of unfair labor practice charges. Therefore, we summarily enforce the Board's order with respect to these charges. *See Grondorf, Field, Black & Co. v. NLRB,* 107 F.3d 882, 885 (D.C.Cir.1997); *Intl. Union of Petroleum & Indus. Workers v. NLRB,* 980 F.2d 774, 778 n. 1 (D.C.Cir.1992).

■ As to the remaining charges, we need only address two because the company's other challenges are met by sufficient evidence in the record to support the Board's findings.[3] Those charges involve discharged McQuaide employees Tom Boyes, Jack Boyes, and Dale Salsbury.[4]

■ An employee's discharge violates section 8(a)(3) when the employee's union related activities were a motivating factor in the employer's decision. *See MECO Corp. v. NLRB,* 986 F.2d 1434, 1436 (D.C.Cir.1993). Under the *Wright Line* test, the General Counsel of the Board must first make a prima facie showing of the employer's unlawful motivation. As an affirmative defense, the employer then bears the burden of demonstrating "that it would have taken the same action even if the employee[ ] had not engaged in the protected activity." *Southwest Merchandising Corp. v. NLRB,* 53 F.3d 1334, 1339 (D.C.Cir.1995). McQuaide does not contend that the General Counsel failed to meet its burden of proving that McQuaide had a discriminatory motive for discharging Jack Boyes, Tom Boyes, or Dale Salsbury. Rather, the company maintains that the ALJ and the Board failed to give adequate consideration to its *Wright Line* defenses, and that the findings that the company's proffered reasons for the discharges were merely pretextual were not supported by substantial evidence.

## II.

Jack Boyes worked at McQuaide's Richfield, Ohio satellite facility with his father Tom Boyes and another employee, Dale Salsbury. On the night of August 12–13, 1992 Jack Boyes was scheduled to drive a "shuttle" truck from the Richfield terminal to McQuaide's headquarters in Johnstown, Pennsylvania, but failed to report for work. He did not notify the night dispatcher of his absence and apparently never contacted the company again. The dispatcher attempted to contact Jack Boyes by telephone and radio when he realized that Jack was not coming in, but was unsuccessful. On August 14, the company's vice president of operations informed Tom Boyes that Jack Boyes had been terminated because he had never called in to work.

At the hearing before the administrative law judge ("ALJ"), Jack Boyes testified that he had notified the dispatcher of his absence and that he had also telephoned the vice president to explain that he had been ill that

---

3. In reviewing the Board's decision, this court must uphold any factual finding that is supported by substantial evidence on the record considered as a whole, *see* 29 U.S.C. § 160(f) (1988), and the court "owe[s] substantial deference to inferences drawn from these facts." *Caterair Int'l v. NLRB,* 22 F.3d 1114, 1120 (D.C.Cir.1994).

4. McQuaide does not contest that it violated section 8(a)(3) and (1) by suspending employees Tom and Jack Boyes in January 1992 and by denying two days' work to Tom Boyes in March–April 1992. We accordingly summarily affirm the Board's order in those respects as well. *Grondorf, Field, Black & Co.,* 107 F.3d at 885.

night. He claimed that the vice president told him that he was fired because of his excessive absenteeism. The ALJ, however, discredited this testimony because it was not corroborated by the company's telephone records and contradicted the "frank" testimony of the dispatcher. Nevertheless, the ALJ concluded that McQuaide terminated Jack's employment "in retaliation for his active role in the Union's organizing drive." The ALJ based his finding on the shifting explanations offered by the vice president. Despite his initial contention that he fired Jack Boyes on August 13 for failing to report for work, the vice president testified that the company assumed Jack Boyes had abandoned his job after failing to hear from him for ten days. Because of these differing explanations, the ALJ concluded that the company's explanation was merely pretextual. The Board affirmed the ALJ's finding without comment.

■ In addition to the vice president's testimony, the company had offered evidence that it had discharged twenty-three other employees for failing to call in, consistent with a company policy requiring all drivers to contact the dispatcher if they are unable to work. The ALJ did not refer to this evidence in making his findings. Nor does the record permit the court to conclude that other evidence sufficed to refute this evidence without explanation. Although the company's description of its action with regard to the twenty-three employees is not as consistent as it suggests, inasmuch as its vice president admitted that some employees were given additional assignments after their first infraction of company policy, it remains unclear whether in Jack Boyes' case the firing was entirely pretextual.[5] We agree with the company that whether Jack Boyes quit by not reporting for work or was discharged

for failing to report to the dispatcher is merely a matter of semantics. Hence, the ALJ's reliance on the company's shifting explanations, without more, is flawed.

Therefore, we remand this issue to the Board for further consideration of all of the evidence presented by McQuaide in mounting its *Wright Line* defense, including the evidence of past company practice. To rebut the evidence of McQuaide's unlawful motivation, the company still bears the burden of proving that it would have discharged Jack Boyes even if he had not engaged in union activities, *see Southwest Merchandising Corp.*, 53 F.3d at 1339, and we take no position on the correct understanding of the company's evidence nor whether it has met its burden.

### III.

On February 18, 1993, McQuaide discharged the driver it had hired to replace Jack Boyes, leaving Tom Boyes and Dale Salsbury as the only drivers at its Norton, Ohio terminal.[6] The following morning, Tom Boyes called McQuaide's dispatcher to learn if there was any work for him that day.[7] The dispatcher told Tom Boyes that there was not, and that he did not know "what . . . was going on," but instructed Tom to call the night dispatcher later in the day to see what had developed. Similarly Dale Salsbury telephoned the dispatcher on the evening of Friday, February 19 and was informed that the company "was not sending any freight out" to Norton. He was never told to check for work the following Monday or at any time thereafter. According to McQuaide's records, both Tom Boyes and Dale Salsbury were scheduled to work on Monday, February 22 but never reported in to the company. McQuaide's vice president testified that on

---

5. Contrary to McQuaide's contention, the instant case differs from *A & T Mfg. Co. v. United Steelworkers of America*, 276 N.L.R.B. 1183, 1985 WL 46311 (1985), where an employer met its *Wright Line* burden by establishing that the discharged employee had violated a rule requiring "employees to call in on days of absence." Unlike McQuaide, the employer in that case consistently followed a written rule that "specifie[d] discharge as the penalty for unreported absences." *Id.* at 1183. Furthermore, the employee had been discharged after repeatedly failing to report

his absences, rather than on the basis of a single isolated incident.

6. McQuaide's Richfield satellite facility was relocated to Norton in early February 1993.

7. Tom Boyes initially testified that he had called the dispatcher two other times on February 19 but later conceded that he called only once that morning. The ALJ also refused to credit Tom's testimony that he called the company on February 22.

the morning of February 23, he instructed the dispatcher to call the two drivers at their homes. Specifically, he told the dispatcher "Let's make sure we make an attempt to get a hold of these guys, so they can't say we didn't try to call them." The dispatcher testified that he left a message with an unidentified female at Tom Boyes' home and a message on Dale Salsbury's answering machine, asking each driver to return his call. Neither driver received these messages; nor did the company ever make another effort to contact them. The only remaining communication between the company and the drivers was a letter of termination, dated February 24, in which the company informed each driver that his record had been marked "Quit without notice."

The ALJ and the Board rejected the company's defense that the two drivers had abandoned their jobs and concluded that McQuaide had "constructively discharged" Tom Boyes and Dale Salsbury on February 19 and 20, respectively, by withholding work from them. The ALJ considered the messages left for the drivers as a "perfunctory effort" to contact them which, coupled with the vice president's comment to the dispatcher, suggested that the calls were merely a pretense. Instead, the ALJ concluded that the company hoped that discontinuance of the flow of freight to Norton would encourage the two union activists to quit and moved quickly to conceal its tactics when the opportunity arose. In this regard, the ALJ noted a statement made by McQuaide's president earlier that autumn to the effect that the two drivers would not be around much longer because they were union supporters. The ALJ also emphasized that in the past the company had made far more of an effort to contact its drivers when they failed to appear for work. Furthermore, the company did not suggest in its messages that any work was waiting for Tom and Dale, only that they should return the dispatcher's call. Neither did the messages indicate that the drivers should call back by a certain date. The ALJ thus viewed the evidence as revealing a plot to set up Boyes and Salsbury so that they would leave their jobs, and the Board accepted his findings.

McQuaide initially objects to the finding that Tom Boyes and Dale Salsbury were "constructively discharged" on the ground that the company was never charged with such a violation in the complaint. This contention is meritless. McQuaide was given a full and fair opportunity to litigate the nature of the two drivers' departure. Regardless of whether the company was found to have "discharged" or "constructively discharged" the two drivers, the evidence it proffered in defense was equally relevant. *See Taylor v. FDIC*, 132 F.3d 753, 766 (D.C.Cir.1997) (quoting *Katradis v. Dav–El of Wash.*, 846 F.2d 1482, 1485 (D.C.Cir. 1988)). The company does not suggest that it would have offered any additional evidence or pursued a different litigation strategy if it had been charged with unlawful "constructive discharges." Therefore, the only question is whether the ALJ and the Board's findings that the two drivers had not voluntarily quit their jobs were supported by substantial evidence in the record.

The drivers' behavior following their conversation with the dispatcher casts some doubt on the constructive discharge finding. Instead of calling in on February 22, Salsbury went to visit his daughter near Chicago and Boyes began working for a new employer after meeting with an NLRB investigator about prior charges he had filed against McQuaide. The ALJ seemed to excuse the drivers' actions by noting that they were never told by anyone at McQuaide to call in for work on February 22 or on any other day. But, if as McQuaide contends, standard company policy required the drivers to call in regularly, the fact that they were not instructed to call would be irrelevant. Moreover, Tom Boyes was told to call the night dispatcher on February 22 to check for work, but never bothered to do so. Hence, viewed in isolation the circumstances may suggest that both drivers abandoned their jobs and voluntarily quit. But the ALJ accepted the drivers' explanation that each had concluded that "McQuaide was shutting down its operations at Norton and effectively firing them," from their conversations with the dispatcher on February 19. Thus, the reasonableness of this conclusion was critical to the ALJ's find-

ing that Tom Boyes and Dale Salsbury were constructively discharged.

The company contends on appeal that "[a]t most, [the drivers] were told there was no work available for them on February 19, 1993," not that there would be a prolonged work shortage. Yet the record shows that the dispatcher told Boyes that there was no work and he did not know what was going on. Further, Salsbury was told later that same day that no more shipments were being made to Norton, and was not told to call in for work at a later time. Still the company maintains that a reasonable person would not jump to the conclusion that he had been officially discharged upon hearing such news. The company contends that the drivers would at least have been expected to follow its "long-standing, well understood, and uniformly enforced dispatch procedure of requiring drivers to report in daily to dispatch." But, as we have noted, the company's call-in policy was not uniformly applied insofar as failures to report absences did not invariably result in discharge. And the alacrity with which the company discharged these two drivers lends support to the ALJ's conclusion that its reasons were merely pretextual.

Of particular significance to our conclusion that there is substantial evidence to support the Board's finding of constructive discharge is the fact that from the drivers' perspective it was clear what was happening because it had happened before: after McQuaide discharged Jack Boyes, the company shut down operations at the Richfield facility, because the company claimed it could not operate the terminal with only two drivers.[8] As a result, both Tom Boyes and Dale Salsbury were laid off for almost two months. The company maintains, nevertheless, that the two drivers could not reasonably have thought that operations at Norton were cut off indefinitely on February 19 because during the previous layoff both drivers had been personally told

that the shuttle system was to be temporarily discontinued and had been offered continued employment in Johnstown. But a lot had happened since that time. Earlier in February the drivers had been laid off for approximately one week when the company temporarily moved the shuttle facility from Richfield to Columbiana, Ohio.[9] Beginning in January 1992, Boyes and Salsbury had suffered a succession of layoffs and suspensions. Many of these incidents, the ALJ found, were unfair labor practices in reprisal for the drivers' union activities. Tom Boyes, for example, had been suspended without warning for three days for failing to cover for Jack Boyes on a night when Jack could not drive the shuttle, and Tom Boyes had been wrongfully denied wages on at least one occasion. McQuaide also had refused to allow both drivers to work for several days when they were one driver short, ostensibly because the company had no way to return a shuttle truck to Richfield from Johnstown. Finally, the drivers were well aware of the company's anti-union sentiments because its president told Tom Boyes when he hired him that "he would never employ a union driver behind the wheel of his truck," and later complained to Tom that the Richfield drivers "were nothing but union trouble." By the time of their discharge they had seen two of their fellow drivers, who had been active union supporters, let go and had seen McQuaide engage in various tactics for laying off other employees. Furthermore, nothing in the record indicates that the drivers had any reason to know that this time the company would promptly fill the third driver's position so that the Norton station could continue to operate.

■ Under the circumstances reflected by the evidence before the ALJ, the Board could properly find that Boyes and Salsbury reasonably concluded that they were discharged when work was withheld from them on Feb-

---

8. The ALJ rejected McQuaide's explanation for the layoffs because there was evidence that the company had been able to operate the terminal with only two drivers in the past. Thus, the ALJ concluded that these layoffs violated section 8(a)(3) and (1), and we find no error in this determination.

9. Tom Boyes filed charges against McQuaide, claiming that he had been "constructively discharged" by the transfer to Columbiana because of his union membership, but the ALJ concluded that McQuaide's non-discriminatory explanation successfully rebutted the charges.

ruary 19. Concededly, the question is close. But much of the conflict about what was said and what could reasonably be understood in the context of what had previously happened called for credibility determinations that this court is ill-positioned to second-guess "The ALJ's credibility determinations, as adopted by the Board, are binding unless 'patently without basis in the record.'" *Southwest Merchandising Corp. v. NLRB*, 53 F.3d 1334, 1341 (D.C.Cir.1995) (quoting *Caterair Intl.*, 22 F.3d at 1120). Moreover, the resolution of conflicts in the evidence must be viewed in the context of the on-going conflict between McQuaide and its employees' organizing efforts, an evaluation that the ALJ and the Board were better attuned to perform. It was McQuaide's burden to show, in effect, that the two drivers could not reasonably think that work was being withheld. So viewed, the evidence presents no basis to overturn either the ALJ's credibility determinations, as accepted by the Board, nor his resolution of conflicts and interpretation of the situation at the company's facilities.

Accordingly, we deny the petition except with regard to Jack Boyes' termination, and remand that matter to the Board to address the impact of evidence regarding twenty-three other employees who were discharged for call-in infractions.