# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 8, 2023      Decided November 3, 2023

No. 22-1204

THRIFTY PAYLESS, INC., D/B/A RITE AID,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED FOOD AND COMMERCIAL WORKERS LOCAL
8-GOLDEN STATE,
INTERVENOR

———

Consolidated with 22-1241

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Stephen M. Silvestri* argued the cause for petitioner. With him on the briefs was *Alana R. Glover*.

*Heather Beard*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Jennifer*

*Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, *Milakshmi v. Rajapakse*, Supervisory Attorney, and *Jared D. Cantor*, Senior Attorney.

*Richard Treadwell* was on the brief for intervenor United Food and Commercial Workers Local 8-Golden State in support of respondent.

Before: WALKER and GARCIA, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: Thrifty Payless, Inc., doing business as Rite Aid, seeks judicial review of the National Labor Relations Board's decision that Rite Aid committed unfair labor practices. The Board has cross-applied for enforcement of its order.

There are three issues.

Did Rite Aid bargain to an impasse with the union regarding employee health insurance?

Did an emergency justify Rite Aid's transferring its employees' health insurance from the union-sponsored plan to a company plan?

Was the Board's remedy lawful and proper?

We are mindful that the first issue—did the negotiating parties reach an "impasse"?—poses a question well suited to a panel of social psychologists specializing in the strategy of

negotiations. Many studies deal with the common negotiating refrain, "this is my final offer," when the speaker knows quite well it is not. "Lying," or to put it mildly, "deception," or even more mildly, "bluffing," is an inevitable part of negotiating, whether at a rug bazaar in a Turkish market or in nuclear disarmament talks in Geneva.

Over the years the National Labor Relations Board, in its many iterations, has settled on a multi-factor "test"—which is by no means a "test"—consisting of factors it considers in determining whether the employer and the union have reached an "impasse." One key sign of an impasse may be when the employer does a lockout while the union organizes a strike. *See NLRB v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 287 (1972). Beyond that is a vale of ambiguity.

I.

The first and second issues are fact-bound. A summary of the evidence relating to those issues follows.

Rite Aid operates drug stores and pharmacies. The United Food and Commercial Workers Local 8–Golden State has long represented the company's northern California employees. These Rite Aid employees received their healthcare benefits through the United Food and Commercial Workers Northern California and Drug Employers Health and Welfare Trust Fund. Rite Aid contributed to the Fund at rates set through collective bargaining. In 2018, it was paying into the Fund $3.77 per employee hour.

In early 2018, the Fund's independent consultant, Segal Consulting, reported that the Fund was financially unstable. The Fund had suffered a loss of $6.4 million during the previous eighteen months because of heightened claim activity, cutting its

reserves to $4.4 million. That amount, Segal Consulting determined, left the Fund with reserves that were barely enough to cover roughly two months of claims.

That May, Rite Aid and Local 8 met to discuss the Fund's condition. The union proposed that the company increase its contributions to the Fund. Rite Aid responded that it wanted cost-neutrality—if it were to consider raising its contributions to the Fund, adjustments to other costs had to be factored in. Rite Aid added that it wanted to achieve a long-term solution to the Fund's financial problems.

The parties maintained a dialogue regarding the Fund during the next several months. In October, Local 8 proposed that Rite Aid should increase its contributions to the Fund and that there should be modifications to employee benefits. Local 8 followed up in early January 2019 to solicit the company's response. Rite Aid did not agree to Local 8's proposal but assured the union that it would negotiate a successor collective bargaining agreement ahead of the existing contract's July 2019 expiration date.

Those negotiations—the ones that generated the dispute now before us—kicked off in June 2019. Local 8 presented a proposal that included benefit modifications and an increase in Rite Aid's contributions to $5.72 per employee hour. In the meantime, because the parties' existing agreement was slated to expire on July 13, Local 8 proposed extending that agreement through the end of August, during which time Rite Aid would pay the $5.72 contribution rate contained in the union's proposal. Rite Aid agreed to the extension on July 1.

In August, Rite Aid and Local 8 met to bargain two more times. Rite Aid presented a list of suggested changes, but the union rejected it, claiming that the changes shifted costs onto

employees without raising Rite Aid's contributions or accounting for rising healthcare costs. A few days later, Rite Aid proposed an alternative to the Fund: switching to an employer-sponsored healthcare plan. The parties agreed to extend their existing agreement for another month, through September 30, and to maintain Rite Aid's contributions at the increased level.

In the fall, tensions grew as the parties fleshed out their positions. At a September meeting, Local 8 proposed extending the existing agreement for one year, during which Rite Aid would continue making Fund contributions at the $5.72 rate. Rite Aid suggested instead transferring the employees' health insurance to a company-sponsored plan that it claimed would be less expensive. When Local 8 later pressed Rite Aid on its position regarding the union's offer, Rite Aid wrote that a further extension was a non-starter because of its "draconian" cost but that Rite Aid remained "interested in continuing to bargain."

After the second extension agreement expired, Local 8 initiated boycott actions against Rite Aid. When the parties met again in late October, the union blamed Rite Aid for allowing the agreement to lapse and putting the union "in a position where we've declared war." Rite Aid expressed displeasure regarding the boycotts.[1] Local 8 reiterated its offer to roll over the existing deal with Rite Aid continuing to make the increased contributions.

Rite Aid revealed its economic proposal in a letter it sent a

---

[1] We base our understanding of the bargaining sessions on the meeting notes in the record. These are not verbatim transcripts but the parties largely accept them as sufficiently accurate for our purposes (with an exception we address, *infra*, in footnote 5).

few days after the meeting. Its plan would move employees from the Fund to a Rite Aid-sponsored healthcare plan. It would also provide for greater wage increases as a result of the savings reaped from switching plans. Rite Aid stated that it would not renew the extension agreement and that, because the union had failed to show any movement in its position, "there is nothing to talk about." Even so, it offered to meet "if you [i.e., the union] feel differently."

At the next meeting in November, Local 8's representative announced that the union wanted to understand the two sides' positions to enable it to draft an appropriate proposal. Rite Aid's representative replied that the company would need to enroll employees in a Rite Aid-sponsored plan soon in order to have a January 1 launch but insisted that Rite Aid "d[id]n't care whose name is on" the plan. The company's representative then declared that the parties were "at impasse." Local 8's representative rejected that characterization and promised to come up with a "comprehensive proposal" that would be the "best we think we can do." After the meeting, the union received information from Rite Aid about the healthcare costs of its proposal.

The parties last came together on December 5. They first reviewed the details of Rite Aid's October proposal. Local 8 then presented its counterproposal, which was meant to come "close to what [the union] perceive[d] [Rite Aid's] budget to be." The plan marked a $19.3 million decrease in costs from the union's June proposal, achieved through reduced Rite Aid contributions as well as cuts to employee wage and healthcare offerings.

After two weeks of silence following the meeting, Rite Aid sent a letter on December 20 rejecting the union's proposal as "not a responsible or realistic" way to ensure the Fund's long-

term stability. Because Local 8 refused to entertain having employees leave the Fund, Rite Aid again declared that the parties were "at impasse" and stated it would implement its final offer from October on January 1, 2020. The union pushed back, decrying the claim of impasse as "inaccurate" and maintaining that its proposal "greatly enhances the viability" of the Fund.

Further back-and-forth over email did not prove productive, so on January 1 Rite Aid, as promised, implemented its proposal to move employees to an employer-sponsored plan. (The record does not reveal the Fund's fate or its current financial shape—if it still exists.) Later that month, Local 8 filed unfair labor practice charges with the Board.

An Administrative Law Judge concluded that Rite Aid had committed unfair labor practices in violation of the National Labor Relations Act when it unilaterally implemented its proposal. The ALJ determined that Rite Aid violated its duty to bargain in good faith because it took unilateral action even though the parties had not yet reached an impasse. The ALJ also found that the Fund's financial situation did not give rise to an economic exigency justifying an immediate response.

The Board in August 2022 affirmed the ALJ's findings and conclusions. *Thrifty Payless, Inc. d/b/a Rite Aid*, 371 N.L.R.B. No. 124, 2022 WL 3356576 (Aug. 11, 2022). The Board ordered Rite Aid to cease and desist its unilateral actions and refusal to bargain; to resume bargaining upon the union's request; to rescind the unilateral changes it had made; and to make current employees (and those who retired after January 1, 2020) whole for any loss of benefits suffered due to Rite Aid's actions. Like the ALJ, the Board also imposed a make-whole remedy ordering Rite Aid to make all required payments to the Fund that it had withheld and to reimburse employees for any resulting expenses they incurred. The Board amended that

remedy in part by further obligating Rite Aid to cover all employees who retired after Rite Aid switched out of the Fund and pay back any personal contributions that employees made to the Fund after Rite Aid's action.

## II.

The main issue here is whether Rite Aid was entitled to implement its own proposal instead of continuing negotiations with the union. Sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), (1), obligate an employer to bargain in good faith with its employees' union.[2] *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 347 & n.1 (D.C. Cir. 2011). As a result, an employer can change the conditions of employment only if the parties reach an agreement or if the negotiations break down and result in an impasse, subject to two exceptions that we will take up in a moment. *Id.* at 347–48. In reviewing the Board's decision, we must accept its factual findings so long as they are supported by substantial evidence.[3] *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366–68 (1998); *see* 29 U.S.C. § 160(e).

---

[2] Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees," while section 8(a)(1) prohibits "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the[ir] rights" under the Act. 29 U.S.C. § 158(a)(5), (1). Violating the former automatically results in a violation of the latter. *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 309 n.5 (D.C. Cir. 2003).

[3] Because the Board affirmed the ALJ's findings, we refer to those findings as made by the Board.

9

A.

Rite Aid's primary theory is that the parties were at an impasse when the company moved its employees out of the Fund and into a Rite Aid-sponsored plan. An impasse occurs only when both sides have exhausted the prospects of reaching a deal and are "at the end of their rope," *Oak Harbor Freight Lines, Inc. v. NLRB*, 855 F.3d 436, 444 (D.C. Cir. 2017) (citation omitted), leaving no "realistic prospect" that further discussions will be fruitful, *Teamsters Loc. Union No. 639 v. NLRB*, 924 F.2d 1078, 1083 (D.C. Cir. 1991) (citation omitted). The Board determines the existence of an impasse by considering, among other things, the parties' bargaining history, their good faith in negotiations, the length of the negotiations, the importance of the points of contention, and the "contemporaneous understanding of the parties as to the state of negotiations." *Taft Broad. Co.*, 163 N.L.R.B. 475, 478 (1967), *review denied sub nom. Am. Fed'n of Television & Radio Artists, AFL-CIO, Kan. City Loc. v. NLRB*, 395 F.2d 622, 623 (D.C. Cir. 1968).

The record contains enough evidence to support the Board's finding that the parties were not at an impasse. An impasse arises when neither side is open to compromise. *Grinnell Fire Prot. Sys. Co.*, 328 N.L.R.B. 585, 586 (1999), *enforced*, 236 F.3d 187 (4th Cir. 2000). So each party's understanding of the state of the negotiations takes on "central importance" in the impasse analysis.[4] *Teamsters Loc. Union No. 639*, 924 F.2d at

---

[4] Of course, it is hard to conceive of a scenario—and the caselaw does not suggest one—in which a union will ever declare an impasse. After all, an impasse enables the employer to implement its last offer. That means the union will always contend that talks must go on. So a union's "professions" to that effect must be considered alongside "objective evidence" of the movement in its bargaining position over

1084.

The Board found that Local 8's representative stated in September 2019 that the union would "listen to whatever thoughts" Rite Aid had; that the union proposed further bargaining dates in October even though Rite Aid's representative suggested that there was "nothing to talk about"; and that the union rejected Rite Aid's first declaration of impasse in November by promising to "come back with the best we think we can do." To the Board, those were signals that Local 8 was still amenable to making a deal and did not view the negotiations as having run out of steam.

The union followed up on its assurances in December by making a proposal that marked, as one Board Member put it, "significant movement" toward Rite Aid's position. Rite Aid's main objectives in the negotiations were two-fold: reducing costs and improving the long-term viability of the Fund. Local 8's proposal—developed with input from the Fund's consultant, Segal Consulting—reflected progress on the first objective. It reduced costs by more than $19.3 million compared to the union's previous proposal. The proposal did so by increasing Rite Aid's contributions to the Fund (though to a lesser extent than previous proposals)—and also by making concessions on the employee side, such as foregoing a wage increase for one year, eliminating automatic healthcare enrollment for new hires, and introducing a more cost-effective healthcare partnership tier.

Those hard numbers and proposed changes to benefits tend to show that Local 8 was attempting to find a middle ground

---

the course of the negotiations. *Atrium of Princeton, LLC v. NLRB*, 684 F.3d 1310, 1312–13 (D.C. Cir. 2012).

with Rite Aid.[5]  The union's concessions on costs support the Board's view that there was "reason to believe that further bargaining might [have] produce[d] additional movement." *Hayward Dodge, Inc.*, 292 N.L.R.B. 434, 468 (1989) (citation omitted).

Rite Aid claims that the union's proposal was nonetheless inadequate because the union did not acknowledge Rite Aid's desire to address the Fund's long-term stability.  In support, Rite Aid emphasizes a statement from Local 8's representative at the December 2019 meeting that the union was "giv[ing] up on" "building up the reserves."  A fuller recounting of the statement indicates that the union's representative said the union was giving up on building up reserves "for now" "because [the Fund] was so underfunded"—and then said that if things went well, "we can start to build back up the reserves."  In response, Rite Aid's representative summed up Local 8's position as "help[ing] [Rite Aid] build reserves in a different way," and the union representative agreed.

As to Local 8's supposed failure to account for long-term viability of the Fund, it is true that the union presented its proposal orally at the meeting and did not provide a work-up of the Fund's estimated financial future.  But Rite Aid never tried to determine whether the union's proposal would improve the Fund's fiscal health.  Rite Aid did not take the proposal back to

---

[5]  Rite Aid attacks the Board's finding that Rite Aid's representative, despite her later denial, said in the December meeting that the union's proposal showed significant movement.  This amounted to a credibility determination and only "the starkest error" could justify setting it aside. *Constellium Rolled Prods. Ravenswood, LLC v. NLRB*, 45 F.4th 234, 243 (D.C. Cir. 2022) (citation omitted). In any event the union's proposal speaks for itself.

its own experts for analysis, it did not confer with the union's experts to understand how they had developed the plan, and it did not seek input from Segal Consulting.[6] If it had done so, Rite Aid would have discovered that the plan at least arguably would have increased reserves (as shown by the later testimony of a consultant for Segal Consulting), triggering Rite Aid's duty to continue negotiating. Particularly given the union's significant movement on costs, Rite Aid's ipse dixit that the proposal was inadequate lends little support to its disregard of the offer.

Rite Aid accuses Local 8 of refusing to consider the company's proposals and needs. Yet Rite Aid elsewhere resists the notion that it was wedded to switching to a Rite Aid-sponsored plan rather than adjusting the Fund. And there are some indications that the union's disinterest in that option did not necessarily reflect an overall rejection of Rite Aid's position. For instance, when Rite Aid expressed displeasure at the proposed increases to its Fund contributions, Local 8 made cuts between $0.20 and $0.70 per employee hour to the contribution level it proposed for each year of its plan. The union also eliminated automatic healthcare enrollment in its December proposal after Rite Aid first proposed that idea in August.

True, we have held that an impasse occurs when an employer issues an ultimatum on a certain topic and the union comes up short of fully agreeing with that demand. *Mike-Sell's Potato Chip Co. v. NLRB*, 807 F.3d 318, 323 (D.C. Cir. 2015).

---

[6] Rite Aid's letter declaring impasse asserted that its actuaries "agree[d]" that the Union's proposal failed to address viability, but neither that letter nor anything else Rite Aid cites demonstrates any substantive analysis of the union's proposal. And Rite Aid does not dispute the Board's express finding that it failed to have its benefit experts analyze the plan.

On the face of it, Local 8's proposal did not fail to satisfy any hard line or last offer laid down by Rite Aid. As a result, Rite Aid could be expected to give the offer a fair shake, not "abruptly" declare impasse after two weeks of inaction. *See id.* at 324–25. At least the Board was warranted in so finding.

The brief duration of the negotiations over Local 8's proposal in December 2019 also tends to support the Board's finding. *See Taft*, 163 N.L.R.B. at 478. At the parties' December meeting, they spent the morning on Rite Aid's most recent proposal, and then took forty-four minutes in the afternoon to discuss the union's proposal. After that, Rite Aid did not engage with the union or Segal Consulting until declaring an impasse two weeks later.

Given the complexity of the issues and their undisputed "importance" to the parties, *see id.*, the Board reasonably concluded that Rite Aid was unjustified in walking away from the bargaining process after less than an hour of negotiations. As one Board Member noted, Local 8's efforts to achieve compromise "warranted a more thorough review and response" from Rite Aid before ending the talks.

Even though Rite Aid and Local 8 met throughout 2018 and 2019, they did not begin negotiating a successor collective bargaining agreement until mid-2019. The union did not receive Rite Aid's economic proposal until October 2019, and only got the cost information in December. So the actual dialogue on the issues that led to the claimed impasse only took place across a handful of sessions, during which the parties came in with new ideas and made changes from their prior proposals. Those interactions culminated in a brief back-and-forth over the latest proposal from each side at the December meeting.

None of that resembles the prolonged dialogue without

signs of movement in the cases that Rite Aid cites. Instead, the records show two sides engaging in a cyclical process of offer, discussion, evaluation, and counteroffer. The Board concluded that the process had not yet been exhausted. Because substantial evidence shows that Rite Aid and Local 8 were not at an impasse, we uphold the Board's determination.[7]

B.

In the alternative, Rite Aid claims it properly implemented its proposal unilaterally even if the parties had not yet reached impasse. An employer's duty to bargain in good faith to agreement or impasse has two exceptions: when the union engages in dilatory tactics to delay bargaining, or when the employer is compelled to act to address an economic exigency. *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 734 (D.C. Cir. 2000).

Rite Aid invokes both exceptions. But under the National Labor Relations Act, "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court" absent "extraordinary circumstances." 29 U.S.C. § 160(e). Rite Aid never raised a dilatory-tactics defense in its exceptions to the ALJ's decision or in its brief before the Board, and there are no extraordinary circumstances that excuse its neglect. We therefore do not consider that argument.

Rite Aid did make an exigency argument before the Board, so it is properly before us. An employer is entitled to take unilateral action to stave off "a dire financial emergency"—one

---

[7] The Board also relied on the parties' lengthy bargaining history and its finding that Rite Aid negotiated in bad faith. We uphold the Board's finding without relying on those factors.

"in which time is of the essence and which demand[s] prompt action." *Cibao Meat Prods., Inc. v. NLRB*, 547 F.3d 336, 340 (2d Cir. 2008); *RBE Elecs. of S.D., Inc.*, 320 N.L.R.B. 80, 82 (1995). The employer bears the burden of showing that there was an economic exigency that "was caused by external events, was beyond the employer's control, or was not reasonably foreseeable." *Vincent Indus. Plastics*, 209 F.3d at 734 (quoting *RBE Elecs.*, 320 N.L.R.B. at 82).

Clearly, the Fund experienced significant financial hardship in 2018 and 2019. Its reserves fell to $4.4 million in early 2018; the previous time they dropped to that level, in 2014, had been unprecedented. From there, the reserves kept dwindling, down to $1.2 million in November 2019. Even though the Board found that the Fund "was able to function through the various fluctuations of claims" for 35 years, the Fund's position in late 2019 was markedly lower than it had been since at least 2014—if not ever.

By December 23, 2019, however, the reserves had risen to more than $1.6 million—a $400,000 increase in the span of a month. That increase notably took place even though months had elapsed since Rite Aid last made the increased contributions to the Fund required under the two extension agreements.

Those circumstances support the Board's determination that time was not of the essence and that prompt action was not necessary. The parties do not explain, and the record does not reveal, why the Fund suddenly experienced a net gain in reserves in December 2019. Even more puzzling, Rite Aid had stopped making heightened contributions under the extension agreements in September, so by December its contributions had returned to their original level. Regardless of what caused the growth in reserves, though, the Board rightly pointed out that the growth calls into question whether Rite Aid really had no choice

but to implement its own plan. And a consultant for Segal Consulting testified that the union's plan would have continued to increase reserves, further undermining Rite Aid's claim.

Any reasonable consideration of exigency must consider "an employer's need to run its business" and the inherently uncertain task of making corporate decisions in the face of a potential crisis. *RBE Elecs.*, 320 N.L.R.B. at 82. Management does not have a crystal ball to help it assess the likelihood of adverse outcomes of various courses of action (or inaction). Here, the Board acknowledged that it was "impossible" for Rite Aid "to predict what claims might come in and how that would impact the reserves." And Rite Aid asserts without contest that the reserves as of November 2019—which apparently were at an historic low—could only cover a few weeks' worth of healthcare coverage for Rite Aid employees. So Rite Aid's concern that inaction could have had damaging consequences is understandable.

Although Rite Aid had some latitude, the Board reasonably found that Rite Aid was not "compelled" to take unilateral action at that time. Rite Aid had known that the Fund was in decline since early 2018, yet allowed more than a year and a half to pass before implementing its plan—and, as explained, Rite Aid decided to implement its plan not in November 2019 but a month later, when reserves were on the rise. *See Quality Health Servs. of P.R., Inc. v. NLRB*, 873 F.3d 375, 388 (1st Cir. 2017). Even then, Rite Aid only acted after walking away from a proposal from Local 8 that might have increased those reserves. And Rite Aid does not explain why it thought it had no alternative.

Absent an exigency, then, Rite Aid had no right to implement its healthcare plan without reaching an agreement or an impasse with Local 8. Because Rite Aid jumped the gun, the

Board properly concluded that Rite Aid committed unfair labor practices in violation of Sections 8(a)(1) and (5).

## III.

Rite Aid also challenges the Board's remedy requiring the company to make all delinquent payments to the Fund. The Board's initial response is that Rite Aid did not preserve its objection to the remedy, and so we must ignore the company's objection. *See* 29 U.S.C. § 160(e).

"[T]he critical inquiry" is whether the arguments in front of the Board were sufficient to put the Board "on notice that the issue might be pursued on appeal." *United Food & Com. Workers Union, Loc. 400 v. NLRB*, 989 F.3d 1034, 1037 (D.C. Cir. 2021) (citation omitted). Rite Aid excepted to the ALJ's "recommended remedy of making all contractually-required contributions to the [Fund]" because "employees have been covered by a substantially similar health plan since Rite Aid's implementation [of its own proposal] after impasse." Now, Rite Aid says that "the remedy should be adjusted" to account for the fact that employees "have received coverage under the Rite Aid health care." That is largely the same point, so the Board had notice of it.

Rite Aid also faults the Board for "actively and substantially alter[ing]" the ALJ's remedy. The Board kept intact the mandate that Rite Aid make all withheld payments to the Fund but also ordered Rite Aid to cover retired employees and reimburse any personal contributions employees had made to the Fund.

To the extent Rite Aid objects to the Board's changes, we cannot consider that argument. A party can challenge the Board's sua sponte amendment to a remedy by moving for

reconsideration of the Board's decision. *See* 29 C.F.R. § 102.48(c). Because there is a mechanism for the Board to consider challenges to its own sua sponte actions, a party must give the Board the first go at resolving such arguments. *See Spectrum Health-Kent Cmty. Campus v. NLRB*, 647 F.3d 341, 349 (D.C. Cir. 2011). Otherwise, there is the bar of § 160(e). *See Teamsters Loc. 115 v. NLRB*, 640 F.2d 392, 398 (D.C. Cir. 1981).

The bulk of Rite Aid's argument concerns the same issue it did present to the Board: whether Rite Aid was entitled to set off the remedy by the amount it had contributed to employees' healthcare coverage under its own plan. Both the original and the amended remedy contained the same core requirement that Rite Aid make all delinquent payments to the Fund, so Rite Aid's setoff argument before the Board sufficed to preserve it for judicial review. *See United Food & Com. Workers Union*, 989 F.3d at 1037.

Rite Aid relies on our decision in *Grondorf, Field, Black & Co. v. NLRB*, where we explained that although the Board enjoys "broad discretion" in fashioning remedies, "its orders must be remedial, not punitive." 107 F.3d 882, 888 (D.C. Cir. 1997). Like Rite Aid, the companies in *Grondorf* challenged a Board order requiring them to make all delinquent payments to the union pension and health and welfare funds. *Id.* We recognized that when "an employer unlawfully ceases contributions to a union benefit fund, the Board, with court approval, generally requires the employer to make up the contributions" in order to make employees whole and restore the fund's viability. *Id.* But when the employer has provided alternative benefits, compelling reimbursement is unwarranted "to the extent that it . . . 'results in a windfall for the union funds.'" *Id.* (citation omitted). As a result, our court in *Grondorf* remanded the order to the Board so the companies

could demonstrate the extent to which their remedial obligations should be reduced to account for the benefits they had provided in the employer-sponsored plans. *Id.*

We follow the same approach here. The Board does not dispute that *Grondorf* is on all fours with this case. We therefore will remand the Board's order to allow Rite Aid to demonstrate whether its "contributions to the [Fund] must be reduced" based on the benefits it provided through its employer-sponsored plan, to "avoid an improper windfall" for the Fund. *Id.* As the Board notes, however, any disputes over the "specific calculations as to the amounts . . . due" should be resolved in a future compliance proceeding. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984); *see* 29 C.F.R. § 102.54(a).

\* \* \*

The Board's determination that Rite Aid was not entitled to implement its own proposal was supported by substantial evidence. To that extent we deny Rite Aid's petition for review. We deny the Board's cross-application for enforcement and remand the order for further proceedings consistent with this opinion.

*So ordered.*