200 F.3d 436 (6th Cir. 1999)
 Loral Defense Systems-Akron, Division of Loral Corporation; Aircraft Braking Systems Corporation, Petitioners/Cross-Respondents,
v.
National Labor Relations Board, Respondent/Cross-Petitioner,
International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW); Local 856, International Union, United Automobile, Aerospace And Agricultural Implement Workers, Intervenors.
 Nos. 97-5223, 97-5224
 UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT
 Argued: August 5, 1999
Decided and Filed: December 8, 1999
Rehearings En Banc Denied Feb. 17, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board. Nos. 8-CA-25507; 8-CA-25508; 8-CA-25765.
 Edward C. Kaminski, AMER, CUNNINGHAM & BRENNAN, Akron, Ohio, Carol MacKenzie, PEARL & MacKENZIE, Syosset, New York, for Petitioners.
 John D. Burgoyne, Julie B. Broido (argued and briefed), Margaret Ann Gaines (briefed), Washington, D.C., for Respondent in No. 97-5223.
 Aileen A. Armstrong, Julie B. Broido, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., Margaret Ann Gaines, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.
 
 
 1
 Jordan Rossen, Associate General Counsel, Detroit, MI, David Roloff, Goldstein & Roloff, Cleveland, OH, Stephen A. Yokich, CORNFIELD & FELDMAN, Chicago, Illinois, for Intervenors.
 
 
 2
 Before: NELSON and MOORE, Circuit Judges; ROSEN, District Judge.*
 
 OPINION
 
 3
 ROSEN, District Judge.
 
 
 4
 Petitioners Loral Defense Systems-Akron ("Loral") and Aircraft Braking Systems Corp. ("Aircraft") petition for review of the Decision and Order of the National Labor Relations Board (the "NLRB") finding that they violated Section 8(a)(5) of the National Labor Relations Act (the "Act"),19 U.S.C. § 158(a)(5), by unilaterally changing health care plans covering employees represented by the UAW. The NLRB cross-petitions for enforcement of its Order[1]. For the reasons stated below, we deny Loral's and Aircraft Braking Systems'Petition and grant the Board's Cross-Petition for enforcement.
 
 I. FACTUAL BACKGROUND
 
 5
 In 1988, Loral and the UAW entered into a collective bargaining agreement ("CBA") which took effect on November 1, 1988. At the time that this first CBA was negotiated, Aircraft was a division of Loral and as a consequence, employees of both entities were covered by the same Agreement. Subsequently, Aircraft was severed from Loral and became an independent corporate entity.
 
 
 6
 The 1988 collective bargaining agreement covering Loral and Aircraft employees was to expire by its own terms on August 10, 1991. In order to enable it to negotiate its own contract, Aircraft filed a unit clarification petition with the NLRB. On July 26, 1991, the Board issued an order determining that the single collective bargaining unit was no longer appropriate in light of the new organizational structure of the companies and, accordingly, created separate units for the Aircraft and Loral employees. Aircraft and Loral continued to recognize the UAW as the exclusive bargaining representative of each unit. Further, both companies continued to operate under the 1988 CBA until its expiration date on August 10, 1991.
 
 
 7
 Both Loral and Aircraft engaged in contract negotiations with the union prior to the expiration date but were unable to reach agreements. On August 10, 1991, Aircraft unilaterally implemented its final contract offer. Loral continued to negotiate with the union after the August 10 expiration date, but the Loral negotiations also reached an impasse and on October 14, 1991, Loral implemented its final offer.
 
 
 8
 As implemented, Loral's final offer contained a provision to provide for "medical benefits under the 80/20 Option of the Comprehensive Medical plan." The agreement also provided that the "Medical Necessity" plan (the plan provided under the expired 1988 CBA) would be terminated. The Comprehensive Medical Plan contained the following provision:
 
 
 9
 The Employer reserves the right to amend or modify any part of this [i.e., the Comprehensive Medical] Plan, including employee contributions or Drug Copayments, but will not do so unless the Plan is likewise amended or modified for non-Bargaining Unit Employees.[2]
 
 
 10
 Loral's reservation of the right to amend or modify the Comprehensive Medical Plan was opposed by the Union.
 
 
 11
 On April 2, 1992, the Union wrote a letter to Leonard Laden, Loral's President, advising him that the Union "stands ready to continue negotiations" for a mutually acceptable collective bargaining agreement. Pursuant to that letter, on July 16, 1992 Loral entered into a Memorandum of Agreement with the Union in which the parties agreed to meet for a period of 15 days for "clarification purposes only" concerning eleven listed subjects with the understanding that "[i]f clarification is reached between the Company and the Union with regard to the eleven items, the implemented contract shall be supplemented to reflect such clarification and the Union's bargaining committee shall unanimously recommend ratification of such modified agreement to the members of Local 856 of the Company." [See J.A. p. 173.] The list of items to be covered in these discussions included
 
 
 12
 Changes to Comprehensive Medical during life of agreement; amount of contributions for comprehensive medical;contributions by retirees for Comprehensive Medical; and reimbursement for Medicare.
 
 
 13
 [See J.A. p. 173, Memorandum of Agreement, § 1(A) (II).][3]
 
 
 14
 Gregory Myer, Loral's Director of Human Resources, met with the Union in these re-opened discussions. At the hearing before the ALJ, Myer testified that the Union "requested that we consider our position on [reserving the right to make] changes to comprehensive medical health plan during the life of the agreement." [J.A. p. 137.] When asked what he told the Union, Myer stated,
 
 
 15
 "I told them that that was something that we were unable to do, was the reason that we came to loggerheads so drastically in it, during the original negotiations. It [i.e., the right to amend or modify the plan] was something that we needed to keep open to us."
 
 
 16
 Id. No agreement was ever reached on any of the subjects.
 
 
 17
 On January 29, 1993, both Loral and Aircraft announced to the Union that effective May 1, 1993, the health care benefits plan for union employees would be changed from the Comprehensive Medical Plan set forth in the implemented proposals to the Aetna Managed Choices Plan.[4] Greg Myer made Loral's formal announcement in a brief meeting with the Union bargaining committee members that day. At the hearing before the ALJ, Union representatives Gregory Megois and David Terry testified that at that January 29 meeting, Myer told them that the medical benefits change was "corporate wide" and "not open for negotiations," and "there wasnothing anybody at the facility could do" about it. [See J.A. pp. 112, 128.][5]
 
 
 18
 Aircraft's Director of Human Resources, Edward Searle, first met with members of the Union's executive bargaining committee on December 17, 1992 to advise them of the soon-to-be announced change in medical benefits; he then met with Union representatives again on December 21 and January 28 or 29, 1993.[6] Union representatives Gregory Megois, David Terry and Don Hurr all testified that when Searle met with them, he told them that the change in health care benefits "came from headquarters" [J.A. pp. 45-8], that he was "not [t]here to negotiate" with them, [J.A. pp. 46, 68, 75], and that he had "no control over the situation." [J.A. p. 75.][7]
 
 
 19
 The Union protested the companies' announcement of the unilateral change in health care plans. [J.A. pp. 68, 169.][8] Notwithstanding the Union's protest, on May 1, 1993, Loral and Aircraft implemented the change from Comprehensive Medical to Managed Choices. On June 7, 1993, the Union filed unfair labor practice charges against the companies. [J.A. pp. 171, 299.]
 
 A.A COMPARISON OF THE HEALTH CARE PLANS
 
 20
 Based upon the testimony and exhibits in the administrative proceedings[9] of this matter, the following charts show the differences between the Aircraft's and Loral's Comprehensive Medical Plan and the Managed Choices Plan:
 
 
 21
 LORAL
TERMS COMPREHENSIVE MANAGED CHOICES MANAGED CHOICES
 MEDICAL IN NETWORK OUT OF NETWORK
CHOICE OF DOCTORS/ ANY (PATIENT'S LIMITED TO DOCTORS/ ANY (PATIENT'S CHOICE)
HOSPITALS CHOICE) HOSPITALS IN NETWORK;
 SPECIALISTS ONLY 
 AS REFERRED BY 
 PRIMARY IN-NETWORK
 PHYSICIAN 
DEDUCTIBLE $200 PER PERSON; NONE (PAY ONLY $500 PER PERSON;
 $600 FOR FAMILY $15 PER OFFICE $1500 FOR FAMILY
 OF 3 OR MORE VISIT) OF 3 OR MORE
CO-PAYMENT AFTER DEDUCTIBLE NONE (PAY ONLY AFTER DEDUCTIBLE
 IS SATISFIED: $15 PER OFFICE IS SATISFIED:
 20% UP TO VISIT) 30%
 CO-PAY MAXIMUM
 
 
 22
 PRESCRIPTION DRUG $4.00 FOR $5.00 FOR GENERIC 20% OF THE
CO-PAYMENT GENERIC DRUGS; DRUGS; $5.00 PLUS PRICE OF GENERIC DRUGS;
 $6.00 FOR BRAND- DIFFERENCE BETWEEN FOR BRAND-NAME DRUGS,
 NAME DRUGS COST OF GENERIC 20% OF THE PRICE
 AND BRAND-NAME OF THE BRAND-NAME DRUG
 FOR BRAND-NAME DRUGS PLUS DIFFERENCE BETWEEN PRICE
 OF BRAND-NAME AND GENERIC
CO-PAYMENT $1,500 NO LIMIT ON OUT- $3,500 PER PERSON;
MAXIMUM OF-POCKET EXPOSURE $10,500 FOR 
 FAMILY OF 3 0R MORE
LIFETIME BENEFITS UNLIMITED $1,000,000 $1,000,000
 
 
 23
 AIRCRAFT
TERMS COMPREHENSIVE MANAGED CHOICES MANAGED CHOICES
 MEDICAL IN NETWORK OUT OF NETWORK
CHOICE OF ANY (PATIENT'S LIMITED TO DOCTORS/ ANY (PATIENT'S CHOICE)
DOCTORS/ HOSPITALS CHOICE) HOSPITALS IN NETWORK;
 SPECIALISTS ONLY AS
 REFERRED BY PRIMARY
 IN-NETWORK PHYSICIAN
DEDUCTIBLE $100 PER PERSON; NONE (PAY ONLY $500 PER PERSON;
 $300 FOR FAMILY $15 PER OFFICE $1500 FOR FAMILY
 OF 3 OR MORE VISIT) OF 3 OR MORE
CO-PAYMENT AFTER DEDUCTIBLE NONE (PAY ONLY AFTER DEDUCTIBLE
 IS SATISFIED: 15% $15 PER IS SATISFIED: 30%
 UP TO CO-PAY OFFICE VISIT)
 MAXIMUM
 
 
 24
 PRESCRIPTION DRUG $4.00 FOR $5.00 FOR GENERIC 20% OF THE PRICE
CO-PAYMENT GENERIC DRUGS; DRUGS; $5.00 PLUS OF GENERIC DRUGS; FOR
 $6.00 FOR DIFFERENCE BETWEEN COST BRAND-NAME DRUGS, 20%
 BRAND-NAME DRUGS OF GENERIC AND BRAND- OF THE PRICE OF THE
 NAME FOR BRAND- BRAND-NAME DRUG PLUS
 NAME DRUGS DIFFERENCE BETWEEN PRICE OF
 BRAND-NAME AND GENERIC
CO-PAYMENT $1,000 PER PERSON; NO LIMIT ON OUT-OF- $3,500 PER PERSON;
MAXIMUM $1,500 PER FAMILY POCKET EXPOSURE $10,500 FOR FAMILY
 OF 3 0R MORE
LIFETIME UNLIMITED $1,000,000 $1,000,000
BENEFITS
 
 
 25
 IN LIEU OF COMPREHENSIVE MEDICAL, AIRCRAFT EMPLOYEES COULD ELECT COVERAGE UNDER ONE OF THREE HMOs WHICH PROVIDED FOR 100% COVERAGE WITH NO DEDUCTIBLES. THE HMO OPTION WAS ELIMINATED WITH THE IMPLEMENTATION OF MANAGED CHOICES.
 
 B. THE ADMINISTRATIVE PROCEEDINGS
 
 26
 In the administrative proceedings before both the ALJ and the NLRB, Loral and Aircraft argued that they were entitled to unilaterally change health care providers by the language in their implemented 1991 final offers reserving to them "the right to amend or modify" any part of the Comprehensive Medical Plan. Both the ALJ and the Board found no merit in that argument and determined that by unilaterally changing health care plans, Loral and Aircraft violated Section 8(a)(5) of the Act[10].
 
 
 27
 While the Board acknowledged that upon reaching an impasse in negotiations, an employer may implement changes in its last offer so long as the change is "reasonably comprehended" within the final pre-impasse offer, it found that in this case, Loral's and Aircraft's change from the Comprehensive Medical Plan to the Aetna Managed Choices Plan was not "reasonably comprehended" within the original health care proposals rejected by the Union and implemented by the employers. While the Board agreed that the implemented changes reserved to Loral and Aircraft the discretion to "amend" or "modify" the Comprehensive Medical Plan, it determined that the Aetna Managed Choices Plan "was not merely an amendment or modification of an existing plan, but rather constituted a replacement of the plan with an entirely new delivery system for health insurance." The Board found that "[t]his new plan was substantially different from the Comprehensive Medical Plan; it eliminated the option of selecting a health maintenance organization (HMO), the employees' choice of doctors and the $1500 out-of-pocket maximum on costs. It also imposed a $1 million lifetime limit on benefits." Further, the Board observed that with respect to Aircraft's substituted plan, oral surgery benefits were eliminated.
 
 
 28
 Therefore, the Board concluded that Loral and Aircraft were obligated to bargain with the Union prior to changing the health care plans. Having implemented the Aetna Managed Choices Plan without bargaining with the Union over that plan change, the companies were found to be guilty of violating Section 8(a)(5). Therefore, the Board ordered the companies to "rescind the Aetna Managed Choices health insurance plan made effective May 1, 1993, and reinstate the Comprehensive Medical Plan as to bargaining unit employees and make such employees whole for any losses they may have suffered as a result of the plan change."
 
 
 29
 Loral and Aircraft now ask this Court to review and overturn the Board's decision.[11] The NLRB asks the Court to enter an Order of Enforcement.
 
 II. DISCUSSION
 A. STANDARD OF REVIEW
 
 30
 The standard of review in determining whether an employer's post-impasse change in terms or conditions of employment is "reasonably comprehended" within its final pre-impasse offer is a mixed question of fact and law. NLRB v. Plainville Ready Mix Concrete, 44 F.3d 1320, 1326 (6th Cir.), cert. denied, 439 U.S. 986 (1995). The Board's factual findings must be upheld if supported by substantial evidence on the record as a whole. Id., citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456 (1951). The Board's conclusions of law must be affirmed if they are based upon a reasonable defensible construction of the Act. Plainville Ready Mix, supra, citing Ford Motor Co. v. NLRB, 441 U.S. 488, 489 (1979). Finally, as the Court observed in Plainville Ready Mix, "the facts and complexities of the bargaining process are 'particularly amenable to the expertise of the Board as factfinder,' and 'few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes orbetter suited to the expert experience of a Board [that] deals constantly with such problems.'" 44 F.3d at 1325, quoting Bolton-Emerson, Inc. v. NLRB, 899 F.2d 104, 108 (1st Cir. 1990).
 
 
 31
 With respect to the substantial evidence standard, the Universal Camera Court explained that "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 340 U.S. at 477 (internal quotation marks omitted), quoted in American Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 522, 101 S.Ct. 2478 (1981) ("ATMI"). The reviewing court must consider "the record in its entirety. . . , including the body of evidence opposed to the Board's view." Id. at 487-88. But, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." ATMI, 452 U.S. at 523 (internal quotation marks omitted).
 
 
 32
 More recently, in Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 118 S.Ct. 818 (1998), the court equated the substantial evidence standard with "whether on this record it would have been possible for a reasonable jury to reach the [agency's] conclusion." The "substantial evidence" test "gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree that could satisfy a reasonable factfinder." Id., 118 S.Ct. at 828. The agency's findings, thus, will be set aside only "when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera, 340 U.S. at 490. In other words, it is only when a court "cannot conscientiously find that the evidence supporting [the Board's] decision is substantial, when viewed in the light the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Id. at 488.
 
 
 33
 B. THE UNILATERAL CHANGES IN MEDICAL COVERAGE WERE NOT "REASONABLY COMPREHENDED" WITHIN LORAL'S AND AIRCRAFT'S FINAL PRE-IMPASSE OFFERS
 
 
 34
 The controlling law in this Circuit on the issue of post-impasse changes in terms or conditions of employment is NLRB v. Plainville Ready Mix Concrete Company, 44 F.3d 1320 (6th Cir.), cert. denied, 439 U.S. 985 (1995).
 
 
 35
 In Plainville Ready Mix, the NLRB found that the company violated section 8(a)(5) of the NLRA, by implementing only portions of the wage and health plans presented in the company's final pre-impasse offer. Specifically, although the company retained the pre-impasse proposed fixed hourly rate, it did not implement three $.25 per hour wage increases, two incentive pay plans, an offer to pay for six holidays or improvements in the company's health plan which were also contained in the last pre-impasse proposal. The Board, therefore, ordered the company to rescind its unlawful implementations, and to reinstate both the wage plan that existed prior to bargaining impasse (which included the $9.50 per hour fixed wage rate plus incentive and gain sharing) and the health plan as it existed prior to impasse.
 
 
 36
 The Board subsequently petitioned the Sixth Circuit for enforcement of its Order and the Sixth Circuit granted that petition. In so doing, the Court took great pains to set out in detail the applicable law.
 
 
 37
 First, the Court examined the applicable statutory provisions and the policy underlying those provisions:
 
 
 38
 Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees. . . ." Section 8(d) of the Act, 29 U.S.C. § 158(d), establishes "the obligation of the employer and the representative to bargain with each other in good faith with respect to 'wages, hours, and other terms and conditions of employment. . . .'" Fiberboard Paper Prods. Corp. v. NLRB, 370 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964). Thus, unilateral action with respect to any mandatory subject of bargaining is prohibited "for it is a circumvention of the duty to negotiate which frustrates the objective of section 8(a)(5) much as does a flat refusal [to bargain]." NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); Accord NLRB v. Allied Prods. Cor., 548 F.2d 644, 652 (6th Cir. 1977). Notice and an opportunity to bargain about proposed changes are essential to the collective bargaining process. If an employer changes wages or other terms without affording the Union an opportunity for adequate consultation, it "minimizes the influence of organized bargaining" and emphasizes to the employees "that there is no necessity for a collective bargaining agent." May Dep't Stores Co. v. NLRB, 326 U.S. 376, 385, 66 S.Ct. 203, 209, 90 L.Ed. 145 (1945); Accord, NLRB v. J.H. Allison & Co., 165 F.2d 766, 990 (6th Cir.), cert. denied, 335 U.S. 814, 69 S.Ct. 31, 93. L.Ed. 369 (1948).
 
 
 39
 For these reasons, during bargaining negotiations, an employer violates section 8(a)(5) of the Act if it unilaterally institutes changes in existing terms or conditions of employment prior to bargaining to impasse. United Paperworks Int'l Union v. NLRB, 981 F.2d 861, 866 (6th Cir. 1992); Peabody Coal Co. v. NLRB, 725 F.2d 357, 365 (6th Cir. 1984).
 
 
 40
 44 F.3d at 1325-26.
 
 
 41
 The Court then explained the "reasonably comprehended" exception to the mandatory collective bargaining requirement:
 
 
 42
 After the parties have bargained to impasse, that is, after good-faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the Act by making unilateral changes that are "reasonably comprehended within his pre-impasse proposals," United Paperworkers, 981 F.2d at 866, and are consistent with the offers the Union has rejected. Southwest Forest Indus., Inc. v. NLRB, 841 F.2d 270, 273 (9th Cir. 1988). Although an employer's power to change working conditions is not contingent upon Union agreement with the proposed changes, notice and opportunity to consult is required before implementing changes in order to give the Union a reasonable opportunity to offer counter arguments and proposals. A.H. Belo Corp. v. NLRB, 411 F.2d 959, 971 (5th Cir. 1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970). Therefore, the employer may not implement changes "which are substantially different from. . . any which the employer has proposed during its negotiations. . . ." NLRB v. Crompton-Highland Mills, Inc., 337 U.S. 217, 115, 69 S.Ct. 960, 964, 93 L.Ed. 1320 (1949). As the Fifth Circuit has stated, "implementing changes significantly different from those proposed to and rejected by the collective bargaining representative is tantamount to implementing changes without notifying the Union of the proposed changes." Winn-Dixie Stores, Inc. v. NLRB, 567 F.2d 1343, 1350 (5th Cir.), modified on other grounds, 575 F.2d 1107 (5th Cir.), cert. denied, 439 U.S. 985, 100 S.Ct. 576, 58 L.Ed.2d 656 (1978).
 
 
 43
 44 F.3d at 1326 (emphasis added).
 
 
 44
 Plainville Ready Mix makes clear that unilateral implementation of changes which are substantially different from what the employer proposed in its last pre-impasse proposal constitutes a violation of Section 8(a)(5).
 
 
 45
 Turning then to the instant action, there is substantial evidence in the record supporting the Board's factual finding that theAetna Managed Choices Plan unilaterally implemented by Loral and Aircraft was substantially different from the pre-impasse Comprehensive Medical Plan proposal.
 
 
 46
 While the Board acknowledged, as does this Court, that in their last pre-impasse proposal, Aircraft and Loral reserved to their discretion the right to "amend" or "modify" the Comprehensive Medical Plan, more than substantial evidence in the record supports the Board's conclusion that the Aetna Managed Choices Plan constituted a replacement or substitution plan, not an amendment or modification of the Comprehensive Plan.
 
 
 47
 First of all, Edward Searle, Aircraft's Human Resources Director testified before the ALJ that Managed Choices is an entirely new plan. [See J.A. p. 35.] More importantly, an examination of the plan descriptions and comparisons which were part of the record in the administrative proceedings [see J.A. pp. 190-192; 199-245; 247-297; 419-436] demonstrates that Managed Choices is substantially different from the Comprehensive Plan in a number of important elements. First, for Aircraft employees, Managed Choices:
 
 
 48
 did away with oral surgery benefits and
 
 
 49
 eliminated the option of selecting an HMO.
 
 
 50
 For both Aircraft and Loral employees, in order to retain the unfettered right to go to any doctor, the new Plan
 
 
 51
 increased the deductible employees were required to pay and
 
 
 52
 increased their required medical treatment and prescription drug co-payments.
 
 
 53
 Finally, however, the change with the most substantial impact for employees of both companies, regardless of whether they chose "in network" or "out-of-network" health care, is that the personal exposure for out-of-pocket costs is dramatically increased in the Managed Choices plan:
 
 
 54
 the Managed Choices Plan substantially increases the cap on employees' out-of-pocket costs from $1500 to $3500 per person/$10,500 per family for out-of-network, with no limit whatsoever on out-of-pocket exposure within network.
 
 
 55
 Further, the Managed Choices plan imposed a lifetime limit on benefits, whereas under the prior plan there was no limit at all.
 
 
 56
 It was precisely because of similar substantial differences between the pre-impasse health care proposal and the proposal implemented by the employer in Plainville Ready Mix that the Sixth Circuit found a violation of section 8(a)(5). In Plainville, the employer's pre-impasse proposal called for an increase in health care insurance deductibles, employee co-payments, and premiums and also called for adding a number of new benefits, including prescription drug coverage, vision care and an emergency care plan. Post-impasse, the employer fragmented its pre-impasse proposal and implemented the increases in deductibles, employee co-payments and premiums, but did not implement any of the beneficial elements of the proposal. 44 F.3d at 1334. Because the unilaterally- implemented fragmented changes in the health care plan were substantially different from the employer's last pre-impasse proposal, the court determined that the employer violated Section 8(a)(5).
 
 
 57
 This case also presents facts substantially similar to Grondorf, Field, Black & Co. v. NLRB, 107 F.3d 882 (D.C. Cir. 1997). In that case, during negotiations the employers did not propose substituting new benefit plans for the plans set forth in their final contract offer. The only proposal made by the employers was a proposal to limit the companies' contributions to the existing benefit plans. The court determined that having "failed to afford the union a genuine opportunity to bargain over the[] proposal to switch benefit plans,the Companies were not free to implement the substitution of plans on their own." Id. at 885-86. The court explained:
 
 
 58
 According to the testimony credited by the ALJ, although company executives discussed the merits of employer-sponsored plans at the negotiations, the companies neither submitted a concrete proposal to switch employees out of the union plans nor provided documentation or other details about the companies' benefits packages. The only subject of bargaining was the companies' proposal to limit contributions to the union plans, a proposal reiterated in the companies' final offer and ultimately rejected by the union. Having failed to afford the union a genuine opportunity to bargain over their proposal to switch benefit plans, the companies were not free to implement the substitution of plans on their own.
 
 
 59
 107 F.3d at 886 (emphasis added).
 
 
 60
 The foregoing facts and authorities demonstrate that the Board did not err in finding that the unilaterally implemented Managed Choices health plan was not "reasonably comprehended" within Loral's and Aircraft's pre-impasse proposal. This finding is amply supported by substantial evidence in the record. Therefore, the Board correctly determined that the companies violated section 8(a)(5) by not affording the union the opportunity to bargain with them concerning this new plan.
 
 
 61
 Loral argues that it did bargain with the union to impasse on the change to the Managed Choices plan and in support of this contention, points to the July 1992 Memorandum of Agreement in which the Loral and the Union agreed to meet for a period of 15 days only for "clarification purposes only" concerning eleven listed subjects, with the understanding that "[i]f clarification is reached between the Company and the Union with regard to the eleven items, the implemented contract shall be supplemented to reflect such clarification and the Union's bargaining committee shall unanimously recommend ratification of such modified agreement to the members of Local 856 of the Company." [See J.A. p. 173.]
 
 
 62
 Admittedly, the list of items to be covered in these discussions included "Changes to Comprehensive Medical during life of agreement; amount of contributions for comprehensive medical; contributions by retirees for Comprehensive Medical; and reimbursement for Medicare." [See J.A. p. 173, Memorandum of Agreement, § 1(A) (II).] However, just as the Court in Grondorf found with respect to the companies' final offer concerning limiting contributions to the then existing employee benefits, nothing in this Memorandum of Agreement supports Loral's contention that bargaining was had on the substitution of the Managed Choices Plan for the Comprehensive Medical Plan. Furthermore, Greg Myer, Loral's Director of Human Resources, upon whose testimony Loral also relies, testified before the ALJ that the Union "requested that we consider our position on changes to comprehensive medical health plan during the life of the agreement." [J.A. p. 137.] When asked what he told the Union, Myer stated,
 
 
 63
 "I told them that that was something that we were unable to do, was the reason that we came to loggerheads so drastically in it, during the original negotiations. It [i.e., the right to amend or modify the plan] was something that we needed to keep open to us."
 
 
 64
 Id. Again, nothing in Myer's testimony supports Loral's contention that the company and the Union bargained to impasse on the Managed Choices Plan.
 
 
 65
 The companies further argue that the fact they bargained on the Managed Choices Plan is evident from the fact that, after they announced their intent to implement the new plan on May 1, 1993 but before that date, they entertained the Union's request that they consider adding dental coverage to the Plan and, with respectto Aircraft did, in fact, amend the Plan to include dental coverage. However, as the ALJ found,
 
 
 66
 That the Union requested and the [companies] agreed to inclusion of dental coverage does not alter th[e] conclusion [that the companies unilaterally implemented the change in insurance plans.] The [companies] decided to change the insurance coverage and presented this as a completed thing to the Union; thus, a subsequent change in a detail based on the Union's request did not make initial implementation lawful. Further, whatever negotiations the parties had after January 29 about a particular coverage under Managed Choices, there could have been no altering the decision to change plans.
 
 
 67
 [J.A. p. 6.]
 
 
 68
 The ALJ's determination is supported by substantial evidence in the record. As indicated above, the ALJ credited the testimony of a number of Union witnesses who testified that both Loral's and Aircraft's Human Resources Directors, Edward Searle and Gregory Myer, told them in January 1993 that the decision to change from Comprehensive Medical to Managed Choices was effectively a "done deal" and not open to negotiation. Although the companies argue that the ALJ ignored their witnesses' testimony that they did not tell Union bargaining committee members that the matter was not negotiable, which witnesses' testimony is to be credited is a matter left to the finder of fact. The mere possibility of drawing two inconsistent conclusions from the evidence is not tantamount to a determination that the ALJ's finding is not supported by substantial evidence. American Textile Mfrs. Inst. v. Donovan, supra, 452 U.S. at 523. As indicated above, the substantial evidence test "requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree that could satisfy a reasonable fact finder." Allentown Mack Sales & Serv., Inc. v. NLRB, supra, 118 S.Ct. at 828.
 
 
 69
 Further, nothing in the record even remotely suggests that after January 29, 1993 either company ever considered altering its stance with regard to implementing the change to Managed Choices. The best that can be said of the February-March 1993 dental coverage discussions was that they reflect an attempt by Aircraft and Loral to make acceptance of the new Managed Choices plan more palatable to the rank and file.
 
 
 70
 Therefore, the Court finds no error in the ALJ's determination that discussions with the Union leading to an agreement to amend coverage under Managed Choices after the unilateral decision to implement the new plan was made does not amount to bargaining on the decision to change from Comprehensive Medical to Managed Choices.
 
 
 71
 Loral and Aircraft also argue that the Court should overturn the Board's decision because it relied upon the ALJ's findings of facts, and the ALJ failed to address in his decision the evidence the companies presented which they contend contradict his findings. Specifically, they point to the ALJ's failure to acknowledge that Gregory Myer denied telling the Union representatives that implementation of Managed Choices was not negotiable and, instead, credited the Union witnesses' testimony that he told them the matter was not open to negotiation. The companies further argue that the ALJ blanketly credited the Union witnesses' testimony, failing to mention that one of the witnesses, Gregory Megois, was the Union secretary, and as such, was responsible for taking notes at Union meetings. However, Megois could not produce in the administrative proceedings before the ALJ any notes from any of the meetings with either Aircraft or Loral concerning implementation of the Managed Choices plan. According to the companies, this indicates that Megois lacks credibility and the ALJ, therefore,should have discredited his testimony.
 
 
 72
 However, as the First Circuit stated in its recent decision in NLRB v. Beverly Enterprises-Massachusetts, 174 F.3d 13 (1st Cir. 1999), the fact that the ALJ's opinion failed to discuss all of the testimony and evidence presented to him does not mean that the ALJ "failed to consider" the evidence. Id. at 26. The Beverly court explained:
 
 
 73
 An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make "explicit credibility findings" as to each bit of conflicting testimony, so long as his factual findings as a whole show that he "implicitly resolve[d]" such conflicts.
 
 
 74
 Id. (Citations omitted). See also, NLRB v. Katz's Delicatessen of Houston St., Inc., 80 F.3d 755, 765 (2d Cir. 1996) (An ALJ may resolve credibility disputes implicitly rather than explicitly where his "treatment of the evidence is supported by the record as a whole.")
 
 
 75
 Although the ALJ's decision in this case may not be a model of clarity and detail, as was the case in Beverly and in Katz's Delicatessen, the ALJ's treatment of the evidence in this case is more than amply supported by the record as a whole.
 
 
 76
 The companies further argue that the Board's decision should be overruled because the ALJ "lumped together" his findings concerning Aircraft and Loral, and in so doing, misstated some facts. The ALJ's decision does, in fact, contain some misstatements of fact. For example, the ALJ failed to note the specific dates in December 1992 and January 1993 on which the respective companies' representatives met with the Union to announce their intention to implement Managed Choices. He also failed to note the differences between Aircraft's and Loral's versions of the Comprehensive Medical Plan, treating the two companies' versions of that Plan as one and the same. However, the Court does not find these misstatements of fact to be material inasmuch as they do not affect the Board's conclusion that the new Managed Choices Plan was substantially different from the replaced Comprehensive Medical Plan, and as indicated above, there is substantial evidence in the record to support that conclusion.
 
 III. CONCLUSION
 
 77
 For all of the reasons stated above, Loral's and Aircraft's petition to review and overrule the NLRB's Decision and Order is DENIED and the Board's cross-petition for enforcement of that Order is GRANTED.[12]
 
 DISSENT
 
 78
 DAVID A. NELSON, Circuit Judge, dissenting.
 
 
 79
 The medical plan that was implemented in 1991 expressly permitted the employer to make future unilateral modifications in any part of the plan - changing "employee contributions," e.g. - as long as the modifications applied to union and non-union employees alike. The administrative law judge would have held it impermissible, under the National Labor Relations Act, to reserve the right to change the plan unilaterally. The National Labor Relations Board declined to reach that issue; acknowledging the reservation of a unilateral right to amend or modify the 1991 plan on a non-discriminatory basis, the Board concluded that the unilaterally-implemented 1993 plan, although applicable to union and non-union employees alike, was "not merely an amendment or modification of an existing plan, but rather constituted a replacement of the plan with an entirely new delivery system for health insurance." As a replacement rather than an amendment, the Board held, the 1993 plan did not constitute a change "reasonably comprehended" within the unilateral change provision of the 1991 plan.
 
 
 80
 My colleagues on the panel agree with the Board. I do not. The 1993 plan, as I read it, did not replace the 1991 scheme with "an entirely new delivery system for health insurance." And I believe that the 1993 changes - some of which worked to the employees' advantage, as the union presumably recognized when, in subsequent bargaining, it accepted the 1993 plan - were reasonably comprehended within the 1991 provision that permitted non-discriminatory changes in "any part" of the plan.
 
 
 81
 I can find no support in the record for the proposition that the 1993 plan introduced "an entirely new delivery system for health insurance." The benefits provided under the 1993 version of the plan were funded by the employer and administered by Aetna - and so were the benefits provided under the 1991 version. There was no change in health care providers; employees were left free to choose among doctors and hospitals, just as they had been in 1991, the only change being that employees were given financial incentives to choose doctors and hospitals within the Aetna "network" and disincentives to go out-of-network.
 
 
 82
 It is true that the name of the plan was changed in 1993. I take it, however, that the name is as much a part of the plan as any other part. Surely a change in name is "reasonably comprehended" within a provision expressly reserving the right to amend or modify "any part" of the plan.
 
 
 83
 Not to have changed the name of the plan might have suggested that the 1993 version was less advantageous to employees than it really was. This is so because the full name given the Loral plan in 1991 - "Loral Comprehensive Medical Plan (80/20)" - referred to a co-payment feature under which the employer paid only 80 percent of certain health costs, and the employee was required to pay the remaining 20 percent. For employees choosing doctors and hospitals within the Aetna network, this co-payment feature was essentially eliminated in 1993.
 
 
 84
 Before the 1993 changes, the record shows, an unmarried Loral employee not only had to pay the first $200 in annual health costs out of his own pocket, he had to pay 20 percent of all additional costs until the additional costs reached $7,500. After the 1993 changes, by contrast, an employee who chose doctors and hospitals outside the Aetna network would face a $500 deductible and a 30 percent co-payment obligation. If the employee chose doctors and hospitals within the Aetna network, however, he got a better deal than that provided under the old "80/20" plan;under the new plan, such an employee faced no deductible or co-payment at all, aside from a charge of $15 per office visit.
 
 
 85
 I confess that I should find myself hard pressed to explain to an employee who needed, say, $7,700 worth of health care and who was content to use network doctors and hospitals why the virtual elimination of the deductible and co-payment features of the "80/20" plan was not "reasonably comprehended" within the plan's non-discriminatory unilateral change provision. I am not sure that such an employee would be particularly sympathetic to an argument that he would be better off paying $1,700 ($200 plus 20 percent of $7,500) out of his own pocket rather than paying only $15 per office visit, notwithstanding the theoretical possibility that at some point during his lifetime the employer's obligation to continue paying his health costs might bump against the $1 million-per-employee cap introduced in 1993.
 
 
 86
 From the employee's standpoint, obviously, the 1993 changes included both pluses and minuses. I have referred to some of the minuses here, and others are mentioned in the majority opinion. But the fact that not all of the changes were beneficial to the employee hardly means that the pluses and minuses added up to "an entirely new delivery system" not comprehended within a unilateral change provision permitting non-discriminatory modifications in "any part" of the plan, "including employee contributions . . . ."
 
 
 87
 Nothing in NLRB v. Plainville Ready Mix Concrete Co., 44 F.3d 1320 (6th Cir.), cert. denied, 516 U.S. 974 (1995), suggests otherwise. That case did not involve a unilateral change provision; this case does.
 
 
 88
 Finally, nothing in the testimony of Human Resources Director E.L. Searle suggests to me that Mr. Searle viewed the 1993 changes as falling outside the unilateral change provision of the 1991 plan. Under cover of a letter dated January 29, 1993, Searle sent the employees of Aircraft Braking Systems Corp. a brochure describing ABSC's new benefit program. The letter begins with this sentence: "The attached brochure provides you with an overview of the benefit changes that will become effective on May 1, 1993." Cross-examined about his letter, Mr. Searle testified as follows:
 
 
 89
 "Q.On June [sic] 29th, 1993, ABS notified the union that it intended to implement an entirely new health insurance plan as of May 1, 1993; correct?
 
 
 90
 A.I am sorry, sir, what was the date?
 
 
 91
 Q.June - January 29th, 1993.
 
 
 92
 MS. MAC KENZIE:Excuse me, may I hear that question again, please.
 
 BY MR. BINSTOCK:
 
 93
 Q.On January 29th, 1993, ABS notified the union that it intended to implement an entirely new health insurance plan as of May 1, 1993?
 
 
 94
 A.There is a letter dated that date, that is not the first that they were notified. But there is a letter with that date.
 
 
 95
 Q.I didn't ask you whether it was first, I just said, did you notify the union on that date.
 
 
 96
 A.There is a letter on that date that was mailed to the employees, yes.
 
 
 97
 Q.And did the letter indicate that there would be a new plan called Managed Choices implemented on May 1, 1993?
 
 
 98
 A.Yes, that letter did indicate that and explained a little bit about the plan."
 
 
 99
 As far as I can see, this testimony neither adds to nor detracts from the documentary evidence. And what the documentary evidence shows, in my view, is a set of changes clearly comprehended within the unilateral change provision of the 1991 plan.
 
 
 100
 But if the rationale employed by the Board in this case was erroneous, as I believe it was, what of the rationale employed by the ALJ? Notwithstanding theplain language of the unilateral change provision of the 1991 plan, the ALJ apparently believed that the National Labor Relations Act prohibited the employer from making any changes in the 1991 plan without first bargaining over such changes to the point of impasse. This issue has not been briefed or argued here. Accordingly, although I would not grant enforcement of the contested portion of the Board's order at this time, I would remand the case to let the Board decide, in the first instance, whether the ALJ's rationale, or some variant of it, is correct as a matter of law.
 
 
 101
 My colleagues on the panel having seen the case differently, I respectfully dissent.
 
 
 
 Notes:
 
 
 *
 The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.
 
 
 [1]
 In its January 1996 Order, the NLRB determined not only that Loral and Aircraft had violated Section 8(a)(5) and (1) as a result of their unilateral changes in health care plans but also found that Aircraft was guilty of separate violations of Section 8(a)(5) and (1) arising out of its failure/refusal to arbitrate certain grievances. The failure to arbitrate portion of the NLRB's Order is not challenged by Aircraft. Therefore, that portion of the Order will be summarily enforced. See Grondorf, Field, Black & Co. v. NLRB, 107 F.3d 882, 885 (D.C. Cir. 1997) (Board's findings that are not challenged on appeal are entitled to summary enforcement).
 
 
 [2]
 Aircraft's final proposal also contained a provision to replace the medical coverage with an 85/15 Comprehensive Medical Plan and prescription drug benefit plan. Aircraft's proposal, like Loral's, also contained a reservation of rights:
 The Company reserves the right to amend or modify the Comprehensive Medical plan; to revise the employee contributions; or to revise the co-payments; but will not do so unless the salaried plan is also revised.
 
 
 [3]
 The July 16, 1992 Memorandum of Agreement in full reads as follows:
 1.At the request of Donald Hurr, Chairman of the Union's Bargaining Committee, a meeting was held between Donald Hurr and Greg T. Myer, Manager of Industrial Relations for the Company, at which time Mr. Hurr stated that certain issues must be clarified before the contract implemented by the Company can be ratified. As a result of that meeting, the parties agree as follows:
 A.The Union agrees to all of the terms and conditions of the implemented contract imposed by the Company on October 14, 1991 with the exception of the following items:
 (I)Funding of the S.U.B. Plan.
 (II)Changes to the Comprehensive Medical during life of Agreement; amount of contributions for Comprehensive Medical; contributions by retirees for Comprehensive Medical; and Reimbursement for Medicare.
 (III)Effective date for 401(K).
 (IV)Effective date of Agreement (i.e.), lump sums, signing bonus, layoff payment.
 (V)2% vacation.
 (VI)Fringe benefits representative.
 (VII)Cost of administering pension plan.
 (VIII)Appendix clarification (3540).
 (IX)All current and laid off employees fifth and six weeks vacation.
 (X)Transition Agreement.
 (XI).Commercial division.
 Discussions relating to the above items or non-resolution of any one or more of the above issues shall not create an arbitrable controversy: i.e., these discussions shall not be the basis for arbitration.
 B.The Company and the Union agree to meet for a period of fifteen (15) days for clarification purposes only with regard to the eleven items listed in "A" above.
 C.If clarification is reached between the Company and the Union with regard to the eleven items, the implemented contract shall be supplemented to reflect such clarification and the Union's bargaining committee shall unanimously recommend ratification of such modified Agreement to the members of Local 856 of the Company.
 D.In event the eleven items are clarified to the satisfaction of the parties, the Union agrees to hold a ratification meeting within ten (10) days of the clarification of the issues.
 E.This Memorandum of Agreement shall lapse by its terms fifteen (15) days from the date of execution at which time if the parties have reached no agreement hereunder, the parties shall revert to their respective postures as of July 1, 1992.
 [J.A. pp. 173-74.]
 
 
 [4]
 This same change in health care coverage applied to salaried and non-Bargaining Unit Employees of the companies.
 
 
 [5]
 In his testimony before the ALJ, although he admitted that he may have told the Union that the medical benefits change was a "corporate-wide" plan, Myer denied saying that the medical benefits change was not open to negotiation. [J.A. pp. 142-44.] Notwithstanding Myer's denial, the ALJ credited the Union witnesses' testimony regarding what Myer told them on January 29th. [See J.A. p. 5.]
 
 
 [6]
 Searle first testified that the January meeting was on the 29th [J.A. p. 35], then later said there was no meeting on the 29th [J.A. pp. 94-5]. However, Aircraft admits that Searle met with the Union leadership on January 28th.
 
 
 [7]
 The ALJ credited the Union witnesses' testimony regarding what Searle told them when he met with them [see J.A. p. 5] despite the fact that Searle, like Gregory Myer, his counterpart at Loral, denied saying that the implementation of the new health benefits plan was not negotiable [J.A. p. 95]. However, as the ALJ noted, Searle did testify that he told the Union that "the structure of the plan was not subject to change," that the company "had the right to revise modify or terminate," and in accordance with that right, was "going to make revisions to the medical benefits plan." [J.A. p. 37].
 
 
 [8]
 Subsequent to the announcements of the companies' decisions to change from the Comprehensive Medical Plan to Managed Choices, company representatives met with union representatives regarding the terms of the Managed Choices plan. Union officials were given booklets outlining the benefits. One of the benefits listed in the booklets was dental coverage. (Dental coverage, including oral surgery, had been a part of Aircraft's Comprehensive Medical plan.) However, Aircraft and Loral officials informed the Union that the companies would not be offering dental benefits to their union employees. [J.A. pp. 90-91; 158.] The Union asked whether the companies could reconsider that issue. Id. Both Aircraft and Loral complied with the Union's request. [J.A. pp. 90, 162.] Ultimately, Aircraft decided to add dental coverage (but not oral surgery) to its plan [J.A. p. 90]. However, because of the Union's displeasure with the amount that Loral wanted to charge its employees for that added benefit, dental coverage was not implemented by Loral. [J.A. pp. 162-64.]
 
 
 [9]
 See J.A. pp. 33-39; 116-117; 199-244; 419-435.
 
 
 [10]
 The ALJ's conclusion, however, was based upon his rejection of the employers' "waiver" rationale. While the Board agreed with and affirmed the ALJ's finding that by unilaterally changing health care plans, Loral and Aircraft violated Section 8(a)(5), it found it unnecessary to rely on his "waiver" argument.
 
 
 [11]
 Ironically, on December 11, 1996, Loral and the Union agreed to a new collective bargaining agreement to be effective until August 11, 2001. The negotiated agreement is currently in effect. Under this agreement the health care plan continues to be the Managed Choices Plan at issue in this appeal. [See Loral Final Brief, Ex. B.] The new agreement further provides that "the Company shall retain the right to change medical benefit administrators, carriers, insurers, and providers, however, the Company will not change the level of benefits that are now being provided." Id. ¶ 8.
 
 
 [12]
 Loral has indicated that subsequent to the administrative proceedings giving rise to this appeal, on December 11, 1996, Loral and the Union agreed to a collective bargaining agreement which incorporates the Managed Choices Plan. This, Loral contends, renders the Board's Order moot. We, however, do not find the Board's Order to be moot. The Board's Order provides, in relevant part:
 If the Union requests, [Respondent shall] rescind the Aetna Managed Choices health insurance plan. . . and reinstate the Comprehensive Medical Plan as to bargaining unit employees and make such employees whole for any losses they may have suffered as a result of the plan change. . . .
 At least to the extent that employees suffered losses as a result of company's unilateral implementation of the new plan from May 1, 1993 (the date of implementation of Managed Choices) through December 11, 1996, the effective date of the new CBA, at least the make-whole portion of enforcement Order is certainly not moot. As for the rescission and reinstatement provisions, the Order does not mandate such rescission and reinstatement; rather that portion of the order will take effect only if the Union so requests. Presumably, having entered into a new Agreement in which it has agreed to the Managed Choices Plan, the Union will not request rescission of that plan.
 In any event, as the Board has pointed out, such matters are best reserved for determination in separate compliance proceedings. See, Sure Tan, Inc. v. NLRB, 467 U.S. 883, 901-902 (1984) (approving Board's practice of modifying its orders in subsequent compliance proceedings); NLRB v. Deena Artware, Inc., 361 U.S. 398, 412 (1960); NLRB v. Katz's Delicatessen of Houston Street, Inc., supra, 80 F.3d at 770-771.