NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0131n.06

Case No. 22-5718

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Mar 15, 2023
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KIMBERLY SHOWALTER, | ) | |
| Plaintiffs-Appellant, | ) ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| KILOLO KIJAKAZI, Acting Commissioner | ) | KENTUCKY |
| of Social Security, | ) | |
| Defendant-Appellee. | ) ) | OPINION |
| | ) | |

Before: MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Kimberly Showalter applied for disability benefits that an administrative law judge (ALJ) for the Social Security Administration (SSA) denied. She sought review in federal court. But the district court declined to disturb the ALJ's decision. Now, Showalter appeals on the ground that the ALJ did not analyze all the evidence of her impairments. The ALJ's decision is supported by substantial evidence, so we affirm.

## I.

In 2012, Kimberly Showalter applied for disability benefits and was denied. Fast forward to 2018, Showalter worked as a tax preparer and sales representative. At the same time, Showalter was seeking treatment for a series of ailments. From March 2018 to December 2019, she was treated for chronic pain, fibromyalgia, and low potassium levels at one clinic. And throughout 2018 and 2019, she received treatment for neck pain, back pain, and fibromyalgia from another clinic.

While her spine was in normal alignment, she had a limited range of motion and degeneration in her spine. This degeneration caused Showalter to have an abnormal gait. A care provider at the first clinic gave her several non-steroidal anti-inflammatory injections in 2018 and 2019 to help with the pain. And at a follow-up appointment in 2019, Showalter complained of migraine headaches. Showalter continued to report migraine headaches and neck pain through 2020.

Showalter also sought treatment at a third clinic during 2018 and 2019 for chest pain, but her EKG exhibited "normal sinus rhythm." (R. 9, Administrative Record, PageID 638, 641.) She also visited a chiropractor for back and neck pain during 2019 and 2020. Her symptoms improved as she kept going to chiropractic appointments. While her range of motion was still limited, her gait and walking looked normal. Although an MRI revealed that there were slight abnormalities in her spine, the doctor found the results "unremarkable." (*Id.* at PageID 953.)

Apart from her back issues, Showalter visited the emergency room for pelvic pain related to either a cyst on one of Showalter's ovaries or endometriosis in 2019. And Showalter also found out that she had severe fatty liver disease around this time.

In addition to these maladies, Showalter was diagnosed with post-traumatic stress disorder, depression, histrionic personality disorder, and substance abuse disorder. And she reported in 2019 that she had been terminated from her job.

## II.

Showalter applied for disability insurance benefits and supplemental security income in July and August 2019, alleging a disability beginning in March 2019. The SSA denied her application, so she proceeded to an administrative hearing with an ALJ. The ALJ conducted a telephonic hearing. He listened to her testimony, looked at her medical records, and evaluated the

opinions of state agency physicians and psychologists who had evaluated Showalter's files. Based on this evidence, the ALJ determined that Showalter had some "severe impairments," including "degenerative disc disease, fibromyalgia, obesity, fatty liver disease, migraines, anxiety, and depression." (*Id.* at PageID 95.) But the ALJ determined that she was "capable of performing work-related activities" with "reasonable limitations derived from the medical evidence of the record."[1] (*Id.* at PageID 95, 105.)

And the ALJ described her current ability to work—her "residual functional capacity"—as being able to perform "light work," with further limitations, as follows:

> [S]he can frequently climb ramps and stairs. She can frequently balance, stoop, kneel, crawl, and crouch. She should never climb ladders, ropes, or scaffolds, nor have exposure to unprotected heights. The claimant can tolerate no more than frequent exposure to temperature extremes, pulmonary irritants or poor ventilation conditions, vibrations, or workplace hazards such as machinery with moving parts that fail to stop when human contact is lost. She can tolerate no more than moderate levels of noise, as defined in Appendix D of the Selected Characteristics of Occupations. She can perform no more than occasional bilateral overhead reaching, but can frequently reach at or below the shoulder level height bilaterally. She can also perform frequent bilateral handling and fine fingering. The claimant requires an occupation with an established routine, set procedures in place, and with few changes throughout the workday. She can perform no manufacturing sector fast-paced production line or production-paced assembly line work. The claimant can tolerate frequent contact with coworkers and supervisors, but only occasional contact with the general public, and with being off task not to exceed

---

[1] The disability determination is a five-step, sequential inquiry. 20 C.F.R. § 404.1520(a). First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity." *Id.* § 404.1520(a)(4)(i). Second, the ALJ must decide whether an impairment or combination of impairments is severe. *Id.* § 404.1520(a)(4)(ii). Third, the ALJ must determine whether an impairment "meets or equals" a listing in the appendix to the relevant regulations, and if it does the ALJ will find the claimant is disabled. *Id.* § 404.1520(a)(4)(iii). If the impairment doesn't "meet or equal a listed impairment," an ALJ must determine the claimant's residual functional capacity before going to step four. *Id.* § 404.1520(e). Fourth, the ALJ must decide whether a claimant's residual functional capacity allows her to perform the requirements of her "past relevant work." *Id.* § 404.1520(a)(4)(iv). And finally, the ALJ must determine whether the claimant can do other work based on her residual functional capacity, "age, education, and work experience." *Id.* § 404.1520(a)(4)(v). At issue in this case is the ALJ's determination of Showalter's residual functional capacity.

> 10% of the workday in addition to normally scheduled breaks, and missing no more than one day of work per month.

(*Id.* at PageID 99.) The ALJ said that "there are jobs that exist in significant numbers in the national economy" that matched Showalter's "age, education, work experience, and residual functional capacity," such as being an office helper or mailroom clerk. (*Id.* at PageID 107–08.) So, the ALJ concluded, Showalter was not "under a disability, as defined in the Social Security Act." (*Id.* at PageID 108.)

Showalter exhausted her administrative remedies and then sought review of the ALJ's adverse disability determination in federal district court. The district court declined to disturb the ALJ's decision because the ALJ "applied the proper standards in concluding that Showalter was not disabled" and "[h]is decision [wa]s supported by substantial evidence." (R. 14, District Court Order, p. 19.)

Now, Showalter advances five arguments on appeal. And they all boil down to whether the ALJ's decision was supported by substantial evidence. First, Showalter argues that the ALJ mischaracterized the medical evidence in the record and contradicted himself in analyzing her residual functional capacity. Second, she says that the ALJ did not consider the combined effect of Showalter's impairments. Third, Showalter argues that the ALJ created an inconsistency in the record that he didn't explain. Fourth, she says that the ALJ did not follow the correct framework in evaluating Showalter's subjective complaints of pain. And finally, she argues that the ALJ placed too much weight on the evaluations of state agency consultants.

**III.**

Our review in this case is deferential. We "must affirm the ALJ's decision as long as it is supported by substantial evidence and is in accordance with applicable law."[2] *Peabody Coal Co. v. White*, 135 F.3d 416, 419 (6th Cir. 1998) (citation omitted). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Marathon Ashland Petroleum v. Williams*, 733 F.3d 182, 187 (6th Cir. 2013) (citation omitted). None of Showalter's evidentiary arguments overcome this deferential standard of review. We'll address each in turn.

**A.**

The ALJ determined that while Showalter had some physical limitations, her residual functional capacity allowed her to work in some jobs, like being an office helper or mailroom clerk. Showalter says that this determination was error. She argues that the ALJ did not consider her claims that she was "not cooking for everyone as she used to, cleaning only one room a day and taking breaks, shop[ping] with the help of her mother, [and] do[ing] a little at a time." (Appellant Br. at 20–21.) And she says that the ALJ "fail[ed] to examine" her self-reported pain and "failed to ask any questions and develop information that would support his characterization of her activities." (Appellant Br. at 21.) Although not explicit, a charitable reading of Showalter's argument is that the effect of the ALJ's supposedly selective review was to find a higher residual functional capacity than Showalter possessed.

Start with what the ALJ must do. An ALJ must consider how closely a claimant's self-reported symptoms line up with objective medical evidence and other evidence in the record. 20

---

[2] Despite Showalter's framing of her arguments in her briefing, we review the ALJ's decision— not the district court's. *See Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

C.F.R. § 404.1529(a). If a claimant's statements about pain aren't backed up by medical evidence, she won't prevail on a disability claim. *Id.*

In evaluating Showalter's residual functional capacity, the ALJ compared Showalter's self-reported symptoms to the evidence. On the self-reported side of the ledger, the ALJ noted that Showalter "allege[d] that she suffer[ed] from medical conditions that cause her to experience pain, fatigue, stiffness, anxiety, weakness, headaches, and difficulty lifting, squatting, bending, standing, walking, kneeling, climbing stairs, remembering, concentrating, completing tasks, and getting along with others." (R. 9, Administrative Record, PageID 100–01.) And he noted that she said that she could only walk for up to 30 minutes at a time and had difficulty paying attention and managing stress. Nevertheless, the ALJ explained that Showalter "admitted she remains capable of managing her personal care and hygiene, preparing meals, performing typical household chores, driving, going shopping, engaging in hobbies, and spending time with others." (*Id.*)

Turning to the medical evidence, the ALJ looked at the records on Showalter's degenerative disc disease, fibromyalgia, pain management medication, ongoing treatment for back mobility, migraines, fatty liver disease, anxiety, depression, and obesity. He described Showalter's maladies at length by diving into the medical records. He acknowledged that she had a history of "chronic pain" but explained that "the objective findings in this case fail to provide strong support for the claimant's allegations of totally disabling symptoms and limitations." (*Id.* at PageID 101.)

Showalter faults the ALJ for not explicitly acknowledging that some of her activities were limited. But the ALJ explained that "[a]fter careful consideration of the entire record" he found that Showalter had "some significant limitations due to her impairments, such that she should avoid heavier lifting, reaching overhead, and working around hazards and irritants." (*Id.* at PageID 95,

105.) In other words, he considered the evidence of her limitations and tailored her residual functional capacity accordingly.

And we don't require an ALJ to discuss every piece of evidence in the record. *See Loral Def. Sys.-Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (citation omitted)). We simply determine whether "there is substantial evidence in the record to support th[e] conclusion." *Id.* Here there was. Showalter's medical records and testimony revealed that she "had good reflexes, normal neurologic functioning, full grip strength, [and] normal dexterity." (R. 9, Administrative Record, PageID 101.) The ALJ also noted that Showalter's treatment notes explained that she "had linear thought content, good speech and fair judgment and insight." (*Id.* at PageID 102.)

So the record belies Showalter's contention that the ALJ didn't consider her pain reports. Her argument that the ALJ should have asked her more questions fares no better. The burden was on Showalter to present her ailments to the ALJ. The ALJ had no burden to make Showalter's case for her. So Showalter's first argument that the ALJ mischaracterized the evidence fails.

**B.**

Next, Showalter argues that the ALJ didn't consider the combined effect of her impairments in coming up with her residual functional capacity. She points to the fact that the ALJ evaluated each condition individually as evidence that the ALJ did not consider the cumulative effect of the impairments. But, in considering each of her impairments, the ALJ was complying with regulatory requirements to consider all the medical evidence. *See* C.F.R. § 404.1529(a). And in making his residual functional capacity determination, the ALJ referred to Showalter's

"determinable impairments," plural, which he acknowledged "could reasonably be expected to cause the alleged symptoms." (R. 9, Administrative Record, PageID 103.)

So the ALJ looked at each of Showalter's impairments and, "[a]fter careful consideration of the entire record," determined that she possessed a residual functional capacity that could accommodate all those impairments. And under our caselaw, that's enough to establish that the ALJ considered the cumulative effect of Showalter's impairments. *Gooch v. Sec'y of Health & Hum. Servs.*, 833 F.2d 589, 592 (6th Cir. 1987) (explaining that "the fact that each element of the record was discussed individually hardly suggests that the totality of the record was not considered" when the ALJ explained that he had reviewed the entire record).

## C.

Third, Showalter argues that the ALJ created an inconsistency in the record that he did not explain. The ALJ decided that Showalter could "perform no more than occasional bilateral overhead reaching, but c[ould] frequently reach at or below the shoulder level height bilaterally. She c[ould] also perform frequent bilateral handling and fine fingering." (R. 9, Administrative Record, PageID 99.) Later in his opinion, the ALJ said that Showalter's "pain prevent[ed] her from heavier lifting, several postural activities, and consistent reaching, as well as working in environments that are likely [to] exacerbate her conditions." (*Id.* at PageID 101.) Showalter says that the first statement's reference to her ability to "frequently reach" conflicts with the second statement's reference to how she was prevented from "consistent reaching."

But these two don't conflict. For starters, "frequent" is a term of art that means somewhere in the range of one-third to two-thirds of the time spent working. *Dictionary of Occupational Titles*, *App'x C – Components of the Definition Trailer*, 1991 WL 688702. And just because Showalter could frequently reach at or below the shoulder-level height doesn't mean that she could also

engage in general reaching. In other words, the ALJ cabined the kind of reaching she could do and explained that she could frequently do that kind of reaching only—leaving open the conclusion that she couldn't engage in "consistent reaching," which might include reaching in all directions.

And the ALJ's determination that Showalter could engage in some reaching is supported by the medical evidence in the record that she had "good muscle bulk and tone, normal range of motion in all other joints, and normal gait with good stability . . . . [and had] good reflexes, normal neurologic functioning, [and] full grip strength." (R. 9, Administrative Record, PageID 101.); *Smith v.* Halter, 307 F.3d 377, 378 (6th Cir. 2001) ("Our review . . . is limited to determining whether the [ALJ's] findings of fact are supported by substantial evidence."); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 246 (6th Cir. 1987) ("Inherent in this process . . . is a factual determination of the claimant's residual physical capacity."). So we won't disturb that fact determination.

Showalter also argues that "her complete statements and those of the third party, her boyfriend, [must] be considered and must be resolved/explained if contradictory to or detracting from the ALJ's conclusion." (Appellant Br. at 25.) But the ALJ did address her statements and her boyfriend's submission. And he found that the medical evidence, combined with her and her boyfriend's statements, still didn't amount to a disability. The ALJ marshaled much of the record to support that determination. So Showalter's third argument fails.

**D.**

Again attacking the ALJ's consideration of her subjective complaints of pain, Showalter argues that the ALJ did not comply with the regulatory requirements for determining the extent of an impairment in coming up with residual functional capacity. By regulation, in evaluating a claimant's symptoms, an ALJ must complete a two-step process. First, he must determine whether

there is a medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(1). And second, he must evaluate the intensity, persistence, and limiting effects of the symptoms to determine how the symptoms limit the claimant's work-related activities. *See id.*; *id.* § 416.929(c)(3) (explaining that because a claimant's symptoms can indicate an impairment more severe than the medical evidence alone shows an ALJ can consider a host of factors in making the second determination).

Showalter seems to suggest that the ALJ did not evaluate the intensity, persistence, and limiting effects of her symptoms in coming up with her residual functional capacity. But the record undermines her argument. That's because the ALJ properly laid out the two-step process and then explained why the medical evidence didn't support her self-reported symptoms.

For instance, the record showed that although Showalter had some spine abnormalities she walked normally and had access to pain treatment when she needed it. And while Showalter complained of 20 emergency-room trips for migraines in a year, the record lacked that evidence. And the emergency-room visit that was in the record ended with a quick recovery and discharge. The ALJ noted that Showalter's fatty liver disease resulted in only minor limitations, like avoiding heavy lifting.

Turning to her mental health concerns, the ALJ noted that Showalter had done well in treatment but had disrupted her treatment plan by missing appointments, which resulted in a discharge from therapy.

And the ALJ noted that while Showalter's obesity "cause[d] significant limitation in her ability to perform basic work activities," her residual functional capacity would "limit[] [Showalter] to light exertional work . . . [that] accounts for this impairment." (R. 9, Administrative Record, PageID 103.)

10

The ALJ's opinion is no drive-by analysis. He evaluated Showalter's impairments. He determined what abilities she still had. And he determined her residual functional capacity on that basis. In short, he evaluated the intensity, persistence, and limiting effects of Showalter's symptoms. And Showalter's disagreement with his ultimate determination in no way undermines the fact that the ALJ both used the correct legal standard and had substantial evidence to support his determination. So we won't disturb his residual functional capacity determination on this ground either.

**E.**

Finally, Showalter argues that the ALJ did not properly explain how he viewed the opinions of the state agency consultants, physicians, and psychologists who reviewed Showalter's case. An ALJ doesn't "defer or give any specific evidentiary weight . . . to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). Rather, an ALJ determines the persuasiveness of the medical opinion based on its reasoning and consistency. *See* § 404.1520c(a).

Here, the ALJ did just that. He explained that the state agency consultants had "determined the claimant is capable of performing light exertional work . . . and [has] the ability to understand, remember, and carry out simple and detailed instructions, sustain attention for extended periods on detailed tasks, tolerate coworkers and supervisors, adapt to routine changes, and make independent work decisions." (R. 9, Administrative Record, PageID 104.) The ALJ found the consultants' view "generally persuasive." (*Id.*)

The ALJ determined that Showalter's impairments were more severe than the consultants had said, because new evidence—that is, evidence that had not been available to the consultants—suggested that Showalter "ha[d] some limitations due to pain and poor range of motion that

11

prevent[ed] her from performing heavier lifting or reaching." (*Id.*) In short, the ALJ agreed with the consultants and only added that Showalter shouldn't do any heavy lifting.

So contrary to Showalter's argument, the ALJ did explain how he viewed the consultants' opinion. And he incorporated it into his analysis accordingly. We find no error here.

**IV.**

For these reasons, we affirm.